**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
MARIE A. MCCRARY (State Bar No. 262670)
KRISTEN G. SIMPLICIO (State Bar No. 263291)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 271-6469
Facsimile: (415) 449-6469

Attorneys for Plaintiffs Jackie Fitzhenry-Russell and Robin Dale

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACKIE FITZHENRY-RUSSELL AND ROBIN DALE, individuals, on behalf of themselves, the general public and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DR. PEPPER SNAPPLE GROUP, INC., DR PEPPER/SEVEN UP, INC., and DOES 1-50,<br><br>Defendants. | Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated)<br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING LAW; UNFAIR COMPETITION LAW; AND COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION<br><br>JURY TRIAL DEMANDED |

# INTRODUCTION

1.     Plaintiffs Jackie Fitzhenry-Russell and Robin Dale, by and through their counsel, bring this class action against Defendants Dr. Pepper Snapple Group, Inc., and Dr. Pepper/Seven Up, Inc., and Does 1-50, inclusive, on behalf of themselves, the general public, and those similarly situated, for violations of the Consumer Legal Remedies Act, Unfair Competition Law, and False Advertising Law, and for common law fraud, deceit and/or misrepresentation. The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

2.     This case concerns Defendants' false and deceptive labeling, advertising, marketing, and sale of the soft drink, Canada Dry Ginger Ale, as "MADE FROM REAL GINGER." This representation leads consumers to reasonably believe that Defendants' soft drink is made from, and contains, real ginger—i.e., the spice made by chopping or powdering the root of the ginger plant[1]—and that consumers who drink the soft drink will receive the health benefits associated with consuming real ginger.

3.     In truth, Defendants' soft drink is not made from real ginger. Instead, Canada Dry Ginger Ale is made from carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavor," i.e., a chemical flavor compound that is manufactured to mimic the taste of ginger, but provides none of the health benefits of real ginger.

4.     Throughout the Class Period, Defendants prominently made the claim "MADE FROM REAL GINGER" on the front label panel of all of its Canada Dry Ginger Ale cans and bottles, cultivating a wholesome and healthful image in an effort to promote the sale of its soft drink and to compete with small batch ginger ales that do use real ginger to make their ginger

---

[1] *See*, https://en.oxforddictionaries.com/definition/ginger (last visited Mar. 6, 2017) (defining "ginger" as "(1) a hot, fragrant spice made from the rhizome of a plant, which may be chopped or powdered for cooking, preserved in syrup, or candied; (2) a SE Asian plant, which resembles bamboo in appearance, from which ginger is taken."); https://en.oxforddictionaries.com/definition/rhizome (defining "rhizome" as "A continuously growing horizontal underground stem which puts out lateral shoots and adventitious roots at intervals); *see also* https://en.wikipedia.org/wiki/Ginger (last visited Mar. 6, 2017) ("Ginger (Zingiber officinale) is a flowering plant whose rhizome, ginger root or simply ginger, is widely used as a spice or a folk medicine.")

ales. Consumers value the representation "MADE FROM REAL GINGER" because studies have found that real ginger has health benefits when consumed. Defendants' Canada Dry Ginger Ale product labels did not disclose that the soft drink contains no real ginger and that the ginger flavor in the soft drink was manufactured through an artificial process to create a chemical substance that tastes like real ginger. The result is a labeling scheme that is designed to mislead consumers, and which does so effectively.

**PARTIES**

5.     Jackie Fitzhenry-Russell ("Fitzhenry-Russell") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Santa Cruz, California.

6.     Robin Dale ("Dale") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Guerneville, California.  (Fitzhenry-Russell and Dale shall be collectively referred to as "Plaintiffs.")

7.     Defendant Dr. Pepper Snapple Group, Inc. ("DPS") is a corporation existing under the laws of the State of Delaware, having its principal place of business in Plano, Texas.

8.     Defendant Dr. Pepper/Seven Up, Inc ("DPSU") is a corporation existing under the laws of the State of Delaware, having its principal place of business in Plano, Texas. DPSU is a wholly-owned subsidiary of DPS.

9.     The true names and capacities of Defendants sued as Does 1 through 50, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names pursuant to section 474 of the California Code of Civil Procedure.  Plaintiffs will seek leave of Court to amend this Class Action Complaint when said true names and capacities have been ascertained.

10.     The Parties identified in paragraphs 7–8 of this Class Action Complaint are collectively referred to hereafter as "Defendants."

11.     At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

12. At all times herein mentioned, each of the Defendants was a member of, and engaged in, a joint venture, partnership and common enterprise, and acted within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

13. At all times herein mentioned, the acts and omissions of each of the Defendants concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

14. At all times herein mentioned, each of the Defendants ratified each and every act or omission complained of herein.

15. At all times herein mentioned, each of the Defendants aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). Defendant averred on removal that the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this action is a class action in which at least one member of the class is a citizen of a State different from the Defendants.

17. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

19. In accordance with California Civil Code Section 1780(d), Fitzhenry- Russell concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased Canada Dry Ginger Ale in Santa Cruz, California and Capitola, California.

(Fitzhenry- Russell's declaration is attached hereto as Exhibit A.)

20.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## **SUBSTANTIVE ALLEGATIONS**

**Defendants' Ginger Ales.**

21.     Defendant DPS, through its wholly-owned subsidiary DPSU, manufactures, distributes, markets, advertises, and sells soft drinks in the United States under several brand names, including "Canada Dry." Defendants' packaging for the following varieties of Canada Dry Ginger Ale predominately, uniformly, and consistently state on the principal display panel of the product labels that they are "MADE FROM REAL GINGER" (referred to collectively herein as the "Products"):

a)   Ginger Ale;

b)   Ginger Ale – Made With Real Sugar;

c)   Diet Ginger Ale;

d)   Blackberry Ginger Ale;

e)   Cranberry Ginger Ale; and

f)   Diet Cranberry Ginger Ale;

22.     The representation that the Products are "MADE FROM REAL GINGER" was uniformly communicated to Plaintiffs and every other person who purchased any of the Products in California. An exemplar of each of the Products' product label is attached hereto as Exhibit B. The same or substantially similar product label has appeared on each respective product (as those shown in Exhibit B) during the entirety of the Class Period.

23.     As described in detail below, Defendants' advertising and labeling of the Products, as "MADE FROM REAL GINGER" is false, misleading, and intended to induce consumers to purchase the ginger ales, at a premium price, while ultimately failing to meet consumer expectations. These representations deceive and mislead reasonable consumers into believing that the Products are made from, and contain, real ginger— i.e., the spice made by chopping or powdering the root of the ginger plant—and not a chemical flavoring compound designed to mimic the taste of real ginger.

24.     In fact, the Products are not made from real ginger. The Products are made from carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavor," which is a chemical flavoring compound that is manufactured to mimic the taste of ginger, but is not and does not contain real ginger as a reasonable consumer understands it and contains none of the health benefits of real ginger.

**Consumer Demand for Real Ginger**

25.     Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely take nutrition information into consideration in selecting and purchasing food items. Product package labels convey nutrition information to consumers that they use to make purchasing decisions. As noted by FDA commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Consumers attribute a myriad of benefits to ginger and foods made from real ginger.

26.     Ginger has been used for thousands of years for the treatment of numerous ailments, such as colds, nausea, arthritis, migraines, and hypertension. Scientific studies have confirmed that ginger has anti-inflammatory effects and aids in relaxing muscles, is effective in alleviating symptoms of nausea and vomiting, has anti-carcinogenic qualities, and appears to reduce cholesterol and improve lipid metabolism, thereby helping to decrease the risk of cardiovascular disease and diabetes. The benefits of consuming ginger have been widely publicized to consumers in the United States in recent years.

**Federal and State Regulations Governing Food Labeling**

27.     The Food and Drug Administration has defined "natural flavor" to mean "the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional." 21 C.F.R. 501.22(a)(3). In

other words, a "natural flavor" is one that contains some oil, protein, or essence from a plant or animal. But it bears little resemblance to the actual plant or animal from which it is derived. Rather, natural flavors are made in a laboratory by scientists who make determinations on how to replicate a flavor using chemicals found in nature.

28.     While it may be that some oil, protein, essence, or other extraction of the ginger root is used in the creation of the natural ginger flavor Defendants' product is made from, that natural flavor is not "real ginger" as a reasonable consumer would understand it. Rather, the scientists that created the Defendants' Products' "natural flavor" would have isolated proteins from the cells and tissue of the ginger root or extracted oils or essences from the ginger root. But because those isolated compounds may not actually taste like ginger, the scientist would have then combined those extractions with any number of other extractions from other plants and animals to create a flavoring substance that tastes like ginger. *See* https://www.scientificamerican.com/article/what-is-the-difference-be-2002-07-29/ (describing the process for creating natural flavors) (last accessed October 21, 2016).

29.     Identical federal and California laws regulate the content of labels on packaged food and require truthful, accurate information on the labels of packaged foods. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101 and 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

30.     Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or in its labeling. California Health & Safety Code § 110660; 21 U.S.C. § 343(a).

31.     Under the FDCA, the term *false* has its usual meaning of "untruthful," while the

term ***misleading*** is a term of art that covers labels that are technically true, but are likely to deceive consumers. Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

32.     Further in addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations. *See* California Health & Safety Code § 110660 (misbranded if label is false and misleading); California Health & Safety Code § 110705 (misbranded if words, statements and other information required by the Sherman Law are either missing or not sufficiently conspicuous); and California Health & Safety Code § 110740 (misbranded if contains artificial flavoring, artificial coloring and chemical preservatives but fails to adequately disclose that fact on label).

33.     Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded products have no economic value and are legally worthless.

34.     Representing that a soft drink is made from "real ginger" is a statement of fact, and use of this phrase on the labels of packaged food is limited by the aforementioned misbranding laws and regulations.

**Defendants' Marketing and Labeling of its Ginger Ales Violates State and Federal Food Labeling Laws**

35.     The Products are unlawful, misbranded and violate the Sherman Law, California Health & Safety Code § 110660, *et seq.*, because the Products' labels include the phrase "MADE FROM REAL GINGER," even though they are not made from real ginger. Instead, the Products are made from a complex chemical flavoring compound that is manufactured to mimic the taste of ginger, and was created not by using actual ginger root, but in a laboratory through the isolation of proteins, essences, and oils from the cells and tissues of plants and animals and combining them in such a way as to mimic the taste of ginger as a consumer would recognize it. The Products are not made from, and do not contain, real ginger as a reasonable consumer would

understand it to mean, nor do the products contain any of the health benefits that would be obtained if real ginger were used or present.

36. Defendants' marketing, advertising, and sale of the Products violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including but not limited to:

    a. Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

    b. Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

    c. Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

37. Defendants' marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

    d. Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

    e. Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

    f. Section 110740 (a food is misbranded if it contains artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling);

    g. Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

    h. Section 110765, which makes it unlawful for any person to misbrand any food;

and

    i.    Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

38.    Defendants have violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. §§ 101.3, 101.13, 101.14, 101.22, and 101.65 which have been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

**Defendants' Marketing and Labeling of its Ginger Ales is False, Deceptive and Misleading**

39.    A reasonable consumer would expect that the Products contain what Defendants identify them to contain on the product labels and that the labels would not be contrary to the policies or regulations of the State of California and/or the FDA. A reasonable consumer would expect that when Defendants label the Products as "MADE FROM REAL GINGER," the soft drinks are made from, and contain, real ginger— i.e., the spice made by chopping or powdering the root of the ginger plant— not a chemical flavoring compound designed to mimic the taste of real ginger. However, Defendants' products are not "MADE FROM REAL GINGER" as a reasonable consumer understands that phrase, but are made from a chemical flavoring compound designed to mimic the taste of real ginger.

40.    Moreover, Defendants do not disclose on the product labels that the Products are flavored using a chemical compound that was manufactured to mimic the flavor of ginger rather than flavored using real ginger. Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendants' food labeling claims, especially at the point of sale. Consumers would not know the true nature of the ginger flavoring merely by reading the ingredient label; its discovery requires investigation beyond the grocery store and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that the ginger flavor in the soft drink is not a result of the presence of real ginger in the soft drink but instead comes from the chemical compound added to the drink to make it taste like ginger. That, combined with Defendants' active concealment in representing the Products as being "MADE FROM REAL GINGER," and not

disclosing otherwise, gave the average reasonable consumer no reason to suspect that Defendants' representations on the packages were not true, and therefore consumers had no reason to investigate whether the soft drinks contained real ginger. Thus, reasonable consumers relied on Defendants' representations regarding the nature of the Products. Such reliance by consumers is also eminently reasonable, since food companies are prohibited from making false or misleading statements on their products under federal law.

41. Defendants intend and know that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendants have done with the "MADE FROM REAL GINGER" claim.

**Defendants' Website and Other Marketing Confirms That Defendants Intends to Deceive Consumers**

42. Defendants' own long standing advertising and marketing materials show that Defendants intended to deceive consumers into believing the false and deceptive packaging of the Products.

43. For example, Defendants' website located at www.canadadry.com ("Defendants' Website") touts that its soft drinks are "MADE FROM REAL GINGER." In particular, the homepage of Defendants' Website states *three times* that the soft drinks are "MADE FROM REAL GINGER." A screenshot of Defendants' Website's homepage appears below:



http://canadadry.com (last accessed July 17, 2016).

44.    Further, Defendants' advertising campaign emphasizes that the ginger ales are "MADE FROM REAL GINGER." They additionally emphasize that the ginger ales have the health benefits associated with real ginger, including, as discussed, above relaxation. In particular, Defendants' have a television commercial that depicts a worker on "Jack's Ginger Farm" who is harvesting ginger. When he pulls up one of the plants by its stalk, he finds a bottle of Canada Dry Ginger Ale where the ginger root would normally be. The voice-over narrates, "Find your way to relaxation with the crisp soothing taste of real ginger and bubbles. Canada Dry. The root of relaxation." This commercial, which was broadcast throughout the United States, including in California and Colorado, and appears on Defendants' Website, is intended to emphasize and capitalize upon Defendants' representation that the Products are "MADE FROM REAL GINGER." This commercial can be found on the internet at

https://www.youtube.com/watch?v=nvQKChf_ooc (last accessed May 9, 2017). Defendants have been running similar television advertisements throughout the United States depicting Jack's Ginger Farm since at least 2011. Each of these advertisements depicts Jack's Ginger Farm where workers or other people pull up ginger plants by the stalk to discover Canada Dry Ginger Ale where the ginger root would be located, and includes a voice-over narration that claims "real ginger, real taste." An example of such an advertisement that Defendants aired throughout the United States starting at least as early as 2011 and continuing at least through 2013 can be found on the internet at https://www.youtube.com/watch?v=ST7ZWBNlNYg (last accessed May 9, 2017). Another example of a Jack's Ginger Farm advertisement that Defendants aired throughout the United States starting at least as early as 2013 and continuing through at least 2014 can be found on the internet at https://www.youtube.com/watch?v=WpybPki9kdk (last accessed May 9, 2017). Another example of a Jack's Ginger Farm advertisement that Defendants aired throughout the United States starting at least as early as 2014 and continuing through at least 2016 can be found on the internet at https://www.youtube.com/watch?v=-Y5TowjCdeU (last accessed May 9, 2017).

45.     Defendants also permit and encourage their marketing partners, including grocery stores, to advertise, market, and sell the Products as a soft drink "MADE FROM REAL GINGER." Defendants provide their marketing partners information, including posters, signs, end cap displays, etc., that specifically represent that the Products are "MADE FROM REAL GINGER." Further, in sales sheets, sales presentations, and other marketing materials, Defendants state that the Products are "MADE FROM REAL GINGER."

46.     In short, Defendants' advertising and marketing campaign confirms that Defendants intend that consumers be effectively deceived by Defendants' misrepresentations on the Products' product labels.  More specifically, Defendants intend that consumers who read the Products' product labels believe that the Products are made from, and contain, real ginger.

**Defendants Misleadingly Market Their Ginger Ales To Increase Profits and Gain a Competitive Edge**

47.     Defendants do not use real ginger in their sodas as doing so is more expensive than

using flavoring compound. In recent years, numerous studies have found the presence of lead in ginger, and manufacturers and retailers of other products containing ginger root, such as cookies and candies, have been sued by the California Attorney General. Thus, the diligent sourcing and testing procedures that would be required when using real ginger to ensure the product they are selling is safe are more expensive to adopt than simply using "natural flavor." In addition, the cost of real ginger has increased in recent years, due to changes in weather in China, which produces 75% of the world's ginger. *See* http://www.producenews.com/news-dep-menu/test-featured/9579-ginger-prices-skyrocket-on-shrinking-supply (last accessed October 21, 2016).

48. In the last decade, in response to news reports about the dangers of high fructose corn syrup and soda's role in contributing to the increased rates of obesity and diabetes in this country, many consumers are drinking less soda, and are seeking out instead, healthier beverages, like iced teas and flavored waters. *See* http://www.nytimes.com/2015/10/04/upshot/soda-industry-struggles-as-consumer-tastes-change.html?_r=0 (last accessed October 21, 2016). And while soda sales are declining, one segment of the category is on the rise – small companies and brands that emphasize their use of natural ingredients, such as Reed's, Bruce Cost, Maine Root, and Grown Up Soda have entered the market. In 2014, the Specialty Food Association noted that healthy beverages were growing in popularity, as was the market for more sophisticated, specialty sodas containing all natural ingredients. *See* https://www.specialtyfood.com/news/article/rise-healthy-beverages/ (last accessed October 21, 2016). Thus, many small craft soda companies are flourishing in response to increased consumer demand for alternatives to sodas made with high fructose corn syrup, artificial ingredients, and preservatives. Facing a public hostile to "Big Soda" and finding its sales dwindling due to the newer, healthier brands, Defendants have an incentive to emphasize the presence of ginger in the Products to appeal to consumers seeking real ingredients instead of a traditional soda.

49. In making the false, misleading, and deceptive representations, Defendants distinguish their ginger ales from their competitors' products. Defendants knew and intended that consumers would purchase, and pay a premium for, ginger ales labeled as being made from "REAL GINGER," over comparable ginger ales that do not contain these representations on the

product labels. By using this branding strategy, Defendants are stating that their ginger ales are superior to, better than, and more nutritious and healthful than other brands of ginger ales that do not proclaim to be made from "REAL GINGER." For example, other brands of ginger ales that do not contain the false, misleading, and deceptive representation that they are made from "REAL GINGER," include brands such as Dr. Brown's and Vernors.

50.    Further, Defendants knew and intended their representations to help them compete with small batch bottling companies that do make ginger ales from real ginger. Defendants added the "MADE FROM REAL GINGER" representation to their product labels to compete with such small batch bottling companies that have increased in popularity in recent years. For example, Bruce Cost Ginger Ale is made with fresh whole ginger root and represents this fact to consumers in its advertising and on its product packaging.

51.    Because consumers pay a price premium for products made from real ginger, by labeling their products as containing real ginger without actually using the expensive ingredient, Defendants are able to both increase their sales and retain more in profits.

52.    Defendants engaged in the practices complained of herein to further their private interests of: (i) increasing sales their ginger ales, while decreasing the sales of ginger ales that do not claim to be made from real ginger and those ginger ales that are truthfully offered as made from real ginger by Defendants' competitors, and/or (ii) commanding a higher price for their ginger ales because consumers will pay more for these soft drinks due to the consumers' demand for products containing real ginger because of the perceived benefits.

**Defendants Intend to Continue To Market Beverages as Being Made with "Real Ginger" that Do Not Contain Ginger.**

53.    Because of the growing market described in paragraph 48 and because Defendants know consumers rely on representations about the presence of real ginger in beverages, Defendants have an incentive to continue to make such false representations. In addition, other trends suggest that Defendants have no incentive to change their labeling practices.

54.    For example, ginger ale is a particularly strong growing flavor in the healthy soda category. In December 2015, a brand manager for one of Defendants' brands, Schweppes,

described ginger as a "growing flavor trend." *See* http://www.prnewswire.com/news-releases/schweppes-introduces-new-dark-ginger-ale-packed-with-a-refreshing-bolder-taste-300188635.html.

55.     To capitalize on the market, Defendants may not only continue to misleadingly advertise the Products, but they could seek to replicate the misrepresentation in other ways. For example, DPS owns the Schweppes brand, under which it markets and sells a ginger ale in retail stores around the country. While Schweppes does not currently advertise its ginger ale as being made from real ginger, Defendants have an incentive to replicate the successful misrepresentation on that product. That same Defendant also owns the soda brand Stewart's, under which a ginger ale was previously sold. While Defendant only sells other kinds of Stewart's soda today, the booming market for ginger ales creates an incentive to do so, in which case Defendant could decide to falsely sell it as containing real ginger.

56.     Defendants are also likely seeking to diversify their beverage portfolio in response to the changing market, the booming craft soda market, and the decreased demand for traditional sodas from big manufacturers. Recently, Coca-Cola Company purchased the small soda brands of Blue Sky and Hansen's, which both make ginger ales. Defendants, who have in the past acquired smaller companies that compete with their bigger brands (e.g. acquiring the fruit juice company Nantucket Nectar despite selling a much larger fruit juice line under the Snapple brand name), will likely desire to do the same to maintain their competitive edge and ensure they are offering ginger ales at all segments of the market.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Fitzhenry-Russell**

57.     Fitzhenry-Russell has purchased several cases of the Products from Safeway, located in Santa Cruz, CA, and a Lucky, located in Capitola, CA. Over the last two years, Fitzhenry-Russell purchased approximately one case each year. For the two years prior to that, she purchased about one case per month. She typically purchased the original flavor of Canada Dry ginger ale made by Defendants.

58.     Fitzhenry-Russell made each of her purchases of the Products after reading and

relying on the truthfulness of Defendants' product labels that promised that the Products were "MADE FROM REAL GINGER." In addition, on at least five occasions over the past five years, Fitzhenry-Russell saw the TV advertisements described in paragraph 45. She does not recall the exact dates or times she viewed the advertisements, although she recalls seeing the advertisement with the "root of relaxation" voice-over narrative at least one time approximately one year ago. Each time she saw one of the advertisements she was watching television at her home in California. The advertisements reinforced her belief that Defendants' Products were actually made from and contained real ginger and would provide the health benefits of ginger. In particular, each advertisement's depiction of the Product being harvested on Jack's Ginger Farm and attached as the root of an actual ginger plant accompanied by voice-over claims about "real ginger" led her to believe that Defendants' Products were made from and contained real ginger and not a chemical flavoring compound. The "root of relaxation" advertisement also led her to believe that the products would provide the health benefits she associated with real ginger such as stomach calming and relaxation because of the advertisement's claim that you could "find your way to relaxation with the crisp, soothing taste of real ginger." The advertisements made her want to purchase Canada Dry ginger ale, and, in fact, she did purchase Canada Dry Ginger Ale after viewing the advertisements and in reliance upon the truthfulness of the claims in the advertisement.

59. At the time of each purchase, Fitzhenry-Russell saw, read and relied on the "MADE FROM REAL GINGER" statement on the front of the package of the ginger ale. She was attracted to the Products because, when given a choice, she prefers to consume soft drinks made from real ginger for health benefits, namely stomach calming or relaxation. But on each of the Products purchased by Fitzhenry-Russell, Defendants misrepresented the contents of the product as being "MADE FROM REAL GINGER" when they were not. Fitzhenry-Russell believed that the statement meant that each of the Products that she purchased was made from, and contained, real ginger. She reasonably relied on the labels and advertising Defendants placed on the primary display panel of the product.

60. At the time of each purchase of the Products, Fitzhenry-Russell did not know that

the Products that she purchased were not made from real ginger, but instead were made from a chemical flavoring compound derived from ginger and manufactured to mimic the flavor of ginger and which does not contain any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Fitzhenry-Russell.

61.     Fitzhenry-Russell not only purchased the Products because their label said that they were "MADE FROM REAL GINGER," but she also paid more money for the ginger ales than she would have paid for other a similar soft drink that was not labeled as containing real ginger.

62.     Had Defendants not misrepresented (by omission and commission) the true nature of the Products, Fitzhenry-Russell would not have purchased them or, at a very minimum, she would have paid less for the soft drink.

**Plaintiff Dale**

63.     Dale has purchased a number of bottles of the Products from Safeway, located in Guernville, California. Over the last four years, Dale purchased two liter bottles regularly, typically one bottle every two or three months. She typically purchased the original flavor of Canada Dry ginger ale made by Defendants.

64.     Dale made each of her purchases of the Products after reading and relying on the truthfulness of Defendants' product labels that promised that the Products were "MADE FROM REAL GINGER."

65.     At the time of each purchase, Dale saw, read and relied on the "MADE FROM REAL GINGER" statement on the front of the package of the ginger ale. She was attracted to the Products because, when given a choice, she prefers to consume soft drinks made from real ginger for health benefits, namely stomach calming or relaxation. But on each of the Products purchased by Dale, Defendants misrepresented the contents of the product as being "MADE FROM REAL GINGER" when they were not. Dale believed that the statement meant that each of the Products that she purchased was made from, and contained, real ginger. She reasonably relied on the labels and advertising Defendants placed on the primary display panel of the product.

66. At the time of each purchase of the Products, Dale did not know that the Products that she purchased were not made from real ginger, but instead were made with a chemical flavoring compound derived from ginger and manufactured to mimic the flavor of ginger and which does not contain any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Dale.

67. Dale not only purchased the Products because their label said that they were "MADE FROM REAL GINGER," but she also paid more money for the ginger ales than she would have paid for other a similar soft drink that was not labeled as containing real ginger.

68. Had Defendants not misrepresented (by omission and commission) the true nature of the Products, Dale would not have purchased them or, at a very minimum, she would have paid less for the soft drink.

69. Plaintiffs and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under California law; therefore, the Products are worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

70. As a direct and proximate result of Defendants' unfair and wrongful conduct, as set forth herein, Plaintiffs and the class members: (1) were misled into purchasing the Products; (2) received a product that failed to meet their reasonable expectations and Defendants' promises; (3) paid a premium sum of money for a product that was not as represented and, thus, were deprived of the benefit of the bargain because the purchased ginger ale had less value than what was represented by Defendants; and (4) ingested a substance that was other than what was represented by Defendants and that Plaintiffs and class members did not expect.

71. Plaintiffs continue to desire to purchase ginger ale made from real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made from and contain real ginger, Plaintiffs would likely purchase Defendants' Products again in the future. Plaintiffs regularly visit stores where Defendants' Products and other ginger

ale beverages are sold. Because Plaintiffs do not know the formula for Defendants' products and cannot test whether or not the beverages are made from and contain real ginger before purchasing, Plaintiffs will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling their products with the phrase "MADE FROM REAL GINGER" unless the product is actually made from and contains real ginger rather than a natural flavor designed to mimic the taste of real ginger. Likewise, Because of changes in the market, Plaintiffs cannot know at any given time, which brands are owned by Defendants and whether their representations as to the presence of ginger are truthful. Thus, Plaintiffs are likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Plaintiffs could be at risk for buying another one of Defendants' products in reliance on the same or similar misrepresentation.

## CLASS ALLEGATIONS

72. Plaintiffs bring this action against Defendants, on behalf of themselves and all others similarly situated, as a class action pursuant to section 1781 of the California Civil Code. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> All persons who, between December 28, 2012 and the present, purchased any of Defendants' Products. (the "Nationwide Class")

73. Plaintiffs Fitzhenry-Russell and Dale also seek to represent a subclass of those members of the Nationwide Class who purchased the product in California (the "California Subclass").

74. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

75. Numerosity:  Plaintiffs do not know the exact size the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

76. Common Questions Predominate:  This action involves common questions of law

and fact to the potential classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products were made from, and contained, real ginger. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a) whether the Products are "MADE FROM REAL GINGER;"

b) whether Defendants unfairly, unlawfully and/or deceptively misrepresented that the Products are "MADE FROM REAL GINGER;"

c) whether the use of the phrase "MADE FROM REAL GINGER" on the primary display panel of the Products violated Federal and/or California state law;

d) whether the advertising of the product as MADE FROM REAL GINGER causes it to command a premium in the market as compared with similar products that do not make such a claim;

e) whether Defendants' advertising and marketing regarding the Products sold to the class members was likely to deceive the class members and/or was unfair;

f) Whether a "MADE FROM REAL GINGER" claim on product packaging and advertising is material to a reasonable consumer;

g) whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

h) the amount of profits and revenues earned by Defendants as a result of the conduct;

i) whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j) whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon,

and if so, what is the nature of such relief.

77. Typicality: Fitzhenry-Russell's claims are typical of the Class because she purchased at least eight cases of the Products – in reliance on Defendants' misrepresentations and omissions that they were "MADE FROM REAL GINGER." Dale's claims are typical of the Class because she purchased at least twelve two liter bottles of the Products – in reliance on Defendants' misrepresentations and omissions that they were "MADE FROM REAL GINGER." Thus, Plaintiffs and the class members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each class member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

78. Adequacy: Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent them interests and that of the classes. By prevailing on their own claims, Plaintiffs will establish Defendants' liability to all class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

79. Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes

may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

80. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFFS' FIRST CAUSE OF ACTION
### (Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq.*)
### On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass

81. Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

82. Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

83. Plaintiffs and other class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

84. The Products that Plaintiffs (and other similarly situated class members) purchased from Defendants were "goods" within the meaning of California Civil Code § 1761(a).

85. Defendants' acts and practices, set forth in this Class Action Complain, led customers to falsely believe that the Products were made from, and contained, real ginger. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendants have violated, and continue to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2),

Defendants' acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendants' acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendants' acts and practices constitute improper representations that the goods they sell are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendants have disparaged the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code §1770(a)(9), Defendants have advertised goods or services with intent not to sell them as advertised. Finally, regarding California Civil Code §1770(a)(8), Defendants falsely or deceptively market and advertise that, unlike other soft drink manufacturers, it sells ginger ales that are made from "REAL GINGER."

86. Plaintiffs request that this Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendants are not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Class will continue to suffer harm.

87. In Plaintiffs original complaint, filed and served more than thirty days prior to the filing of this First Amended Complaint, Plaintiffs provided Defendants with notice and demand that Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notices and demands, Defendants failed to do so in that, among other things, they failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

88. Plaintiffs also requests that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**PLAINTIFFS' SECOND CAUSE OF ACTION**
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass**

89.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

90.     Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

91.     Defendants made representations and statements (by omission and commission) that led reasonable customers to believe that the Products that they were purchasing were made from, and contained, real ginger.

92.     Plaintiffs and those similarly situated relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth in paragraphs 22-24, 35-46, and 57-68 above.  Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing Defendants' ginger ales or paying less for them.

93.     Defendants' acts and omissions are likely to deceive the general public.

94.     Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits.  Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

95.     The aforementioned practices, which Defendants used, and continue to use, to their significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendants' competitors as well as injury to the general public.

96.     As a direct and proximate result of such actions, Plaintiffs and the other class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

97.     Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

98.     Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

99.     Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they are not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFFS' THIRD CAUSE OF ACTION**
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass**

100.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

101.     Throughout the last four years, at weekly and monthly intervals, Defendants fraudulently and deceptively informed Plaintiffs that the Products were "MADE FROM REAL GINGER." Further, at weekly and monthly intervals over the last four years, Defendants failed to inform Plaintiffs that the Products were not made from real ginger but instead were made from a chemical compound manufactured to mimic the flavor of ginger.

102.     These misrepresentations and omissions were known exclusively to, and actively

concealed by, Defendants, not reasonably known to Plaintiffs, and material at the time they were made. Defendants knew the composition of the Products, and they knew that the soft drinks were flavored using a chemical compound intended to mimic the taste of ginger. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase Defendants' ginger ales. In misleading Plaintiffs and not so informing Plaintiffs, Defendants breached their duty to her. Defendants also gained financially from, and as a result of, their breach.

103. Plaintiffs and those similarly situated relied to their detriment on Defendants' misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

104. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, to purchase the Products.

105. Plaintiffs and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

106. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

107. Defendants' conduct as described herein was wilful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiffs and those similarly situated.

### PLAINTIFFS' FOURTH CAUSE OF ACTION
**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Plaintiffs, the Nationwide Class, and the California Subclass**

108. Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action

Complaint as if set forth herein.

109. Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendants have engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

110. In particular, Defendants have engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110740, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. 101.3, 101.4, 101.13, 101.14, and 101.22, which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

111. In particular, Defendants have engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) misrepresenting that the Products are made from, and contain, real ginger;" and (ii) failing to inform Plaintiff, and those similarly situated, that the Products that they purchased are made with a compound manufactured to mimic the flavor of ginger.

112. Plaintiffs and those similarly situated relied to their detriment on Defendants' unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

113. Defendants' acts and omissions are likely to deceive the general public.

114. Defendants engaged in these deceptive and unlawful practices to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and

prohibited by section 17200, *et seq.* of the California Business and Professions Code.

115. The aforementioned practices, which Defendants have used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

116. As a direct and proximate result of such actions, Plaintiffs and the other class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the class members lost the amount they paid for the Products.

117. As a direct and proximate result of such actions, Defendants have enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

118. Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon.

119. Plaintiffs seeks, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

120. Plaintiffs seeks, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they were not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been

violated herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment as follows:

A.    On Cause of Action Number 1 (for violation of the Consumers Legal Remedies Act), 2 (for violation of the False Advertising Law), and 4 (for violation of the Unfair Competition Law) against Defendants and in favor of Plaintiffs and the other members of the Class as follows:

1.    Declaring that Defendants' use of the phrase "MADE FROM REAL GINGER" on the Products is unlawful and likely to deceive reasonable consumers;

2.    Enjoining Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any ginger beverage from making a "MADE FROM REAL GINGER" claim unless the product contains real ginger;

3.    Enjoining Defendants, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any ginger beverage from making other claims about the inclusion of real ginger in the product (such as "contains real ginger") unless the representation is non-misleading; and

4.    Enjoining Defendants, directly or through any corporation, partnership, subsidiary, division, or other device, in connection with the manufacturing, labeling, packaging, advertising, promotion, offering for sale, sale, or distribution of any soda to not provide to others the means and instrumentalities with which to make any representation prohibited by the above. For the purposes of this paragraph, "means and instrumentalities" means any information, including, but not necessarily limited to, any

advertising, labeling, or promotional, sales training, or purported
substantiation materials, for use by trade customers in their marketing of
such product or service.

B.   On Cause of Action Number 1 (for violation of the Consumers Legal Remedies
Act) against Defendants and in favor of Plaintiffs and the other members of the
Class as follows:

   1.   An award of actual damages, the amount of which is to be determined at
   trial;

   2.   An award of punitive damages, the amount of which is to be determined at
   trial; and

   3.   An award of statutory damages as provided by Civil Code section 1780(b),
   the amount of which is to be determined at trial.

C.   On Causes of Action Numbers 2 (for violation of the False Advertising Law) and 4
(for violation of the Unfair Competition Law) against Defendants and in favor of
Plaintiffs and the other members of the Class:

   1.   For restitution pursuant to, without limitation, the California Business &
   Professions Code §§ 17200, *et seq.* and 17500, *et seq.*;

   2.   For injunctive relief pursuant to, without limitation, the California Business
   & Professions Code §§ 17200, *et seq.* and 17500, *et seq.*; and

   3.   For a declaration that Defendants' above-described trade practices are
   fraudulent and/or unlawful.

D.   On Cause of Action Number 3 (for common law fraud, deceit and/or
misrepresentation) against Defendants and in favor of Plaintiffs and the other
members of the Class:

   1.   An award of compensatory damages, the amount of which is to be
   determined at trial; and

   2.   An award of punitive damages, the amount of which is to be determined at
   trial.

E.    On all Causes of Action against Defendants and in favor of Plaintiffs and the other members of the Class:

    1.    For reasonable attorneys' fees according to proof pursuant to, without limitation, the California Legal Remedies Act and California Code of Civil Procedure § 1021.5;

    2.    For costs of suit incurred; and

    3.    For such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 19, 2017                    **GUTRIDE SAFIER LLP**

/s Seth A. Safier
Adam J. Gutride, Esq.
Seth A. Safier, Esq.
Marie A. McCrary, Esq.
Kristen G. Simplicio, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

Attorneys for Plaintiffs Jackie Fitzhenry-Russell and Robin Dale