UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACKIE FITZHENRY-RUSSELL, ROBIN DALE, and GEGHAM MARGARYAN, as individuals, on behalf of themselves, the general public and those similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>DR. PEPPER SNAPPLE GROUP, INC., DR PEPPER/SEVEN UP, INC., and DOES 1-50,<br><br>       Defendants | Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated); 5:17-cv-04435-NC (consolidated) |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

DECLARATION AND EXPERT REPORT OF

J. MICHAEL DENNIS, PH.D.

April 9, 2018

I, J. Michael Dennis, Ph.D., declare as follows:

1. I have been retained by counsel for the plaintiffs in the matter of *Fitzhenry-Russell, et al.* v. *Dr. Pepper Snapple Group, Inc., Dr Pepper/Seven Up, Inc., and Does 1-50*, Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated); 5:17-cv-04435-NC (consolidated) (N.D. Cal.). If called upon to testify, I would and could testify competently to all such subject matter in this Declaration.

2. I am currently a Senior Vice President at NORC in Chicago, IL. I lead the online panel survey research business for NORC. NORC is one of the premier survey research organizations in the United States. Affiliated with the University of Chicago, NORC has

conducted research for Federal, foundation, and academic clients for 75 years, and is responsible for some of the most prestigious survey projects in the U.S, including the General Social Survey and the Survey of Consumer Finance.  Prior to joining NORC in December 2014, I was a Managing Director at GfK (which acquired my employer Knowledge Networks in 2012).  GfK is the fifth largest market research firm worldwide, offering research services in 90 countries.  I have worked as a survey research expert for more than 20 years, authoring more than 60 articles, conference and seminar papers, or book chapters.  I am recognized as an expert in survey research methods.  I am a frequent speaker at the annual meetings of the American Association for Public Opinion Research ("AAPOR") and the American Statistical Association.  In recognition of my expertise in online surveys, I was appointed to be a member of the AAPOR Task Force on Online Panels that published recommendations for researchers regarding online surveys.

3.  I have been personally involved in the design and conduct of hundreds of statistical surveys using the internet mode of data collection over the last 17 years, including the kinds of consumer surveys that are described in this report.

4.  Designing and conducting surveys about the opinions, perceptions, attitudes, preferences, and values of consumers, voters, members of associations, and citizens is a service that I have provided for my customers for more than 20 years.  I have designed and conducted consumer surveys that have been accepted by courts in the following cases:

- *Price [Miles] v. Philip Morris*. In the Circuit Court, Third Judicial Court, Madison County, Illinois. Case No. 00 L 0112.

- *Zill v. Sprint*. County of Alameda, Superior Court of the State of California. Case No. RG03114147.  Collectively the "cellphone unlocking cases."

- *Ebin v. Kangadis Food Inc.* U.S. District Court for the Southern District of New York. Case No. 1:13-cv-02311.

- *Sachs and Alden v. Toyota Motor Corporation*.   Superior Court of the State of California, County of Los Angeles.  Case No. BC443701.

- *Avram v. Samsung Electronics America, Inc. and Lowe's Home Centers*.   United States District Court for the District Of New Jersey. Civil Action No. 2:11-cv-6973 (KM) (SCM).

- *Geanacopoulos v. Philip Morris, USA*. Commonwealth of Massachusetts Superior Court. Civil Action No. 98-6002-BLSI.

- *Scotts EZ Seed Litigation*. U.S. District Court for the Southern District of New York. Case No. 12-CV-4727 (VB) (PED).

- *Dzielak v Whirlpool.* U.S. District Court District of New Jersey.  Case No. 12-cv-00090 (D.N.J.).

- *Pettit v. Procter & Gamble [RE: Flushable Wipes]*.  U.S. District Court for the Northern District of California. CASE NO. 3:15-CV-02150-RS.

5. I have testified on more than twenty occasions as an expert witness, both in deposition and at trial.

6. During the period 2000 to 2013, I managed all the online panel research conducted by Knowledge Networks (acquired by GfK in January 2012) on behalf of federally funded principal investigators who conduct health, economic, social, and political research.  When I began at Knowledge Networks as the Vice President of Operations and Survey Research in 2000, I was responsible for leading survey research for the company and for developing the probability-based KnowledgePanel, which was the core company asset for Knowledge Networks.  As part of the start-up of Knowledge Networks, I also designed and implemented approximately 20 internally funded surveys in the areas of health, finance, public policy, and consumer research, and oversaw the scientific direction and operational management of the construction of KnowledgePanel.

7. In 2001, I founded the client-facing business unit "Government & Academic Research" for Knowledge Networks.  In the role of Managing Director, I oversaw a staff of more than 50 researchers.  I advised clients on the design of all phases of their survey research projects, including sample design, questionnaire design, quality control procedures, and data analysis. The research I conducted has had to meet the high-quality standards maintained by federal sponsors of statistical surveys funded by agencies such as the U.S. Centers for Disease Control and Prevention, the Environmental Protection Agency, and the National Science Foundation.  I have been the principal investigator for studies funded by the U.S. National Science Foundation.  My opinions have been quoted in The Wall Street Journal, The New York Times, Crain's Chicago Business, and Business Week.

8. Before joining Knowledge Networks, I was a Senior Scientist at Abt Associates, where I managed the data collection for the largest random digit dialing telephone survey in the United States, the National Immunization Survey, which was funded by the U.S. Centers for Disease Control and Prevention with management support from the National Center for Health Statistics.  I also led other survey studies funded by the National Institute on Alcohol Abuse and Alcoholism, the National Cancer Institute, the Social Security Administration, and the White House Office of National Drug Control Policy.

9. The cases in which I have testified as an expert, either at deposition or trial, during the last four years are:

A. May 21, 2014.  Expert Deposition. *Skold v Intel*.  Superior Court of the State of California, County of Santa Clara. Case No. 1-05-CV-039231.

B. June 24-June 25, 2014. Expert Testimony at Trial.  *NCAA Student-Athlete Name and Likeness Licensing Litigation*.  U.S. District Court for Northern District of California. Case No. 4:09-cv-01967-CW.

C. July 3, 2014.  Expert Deposition.  *Socratic Technologies, Inc. v Young Ko et al*. Superior Court of the State of California, City and County of San Francisco. Case No. CGC-13-530955.

D. July 31, 2014. Expert Deposition. *Jeffrey Sachs and James Alden v. Toyota Motor Corporation*.   Superior Court of the State of California, County of Los Angeles. Case No. BC443701.

E. October 7, 2014.  Expert Deposition.  *Ebin v. Kangadis Food Inc*. U.S. District Court for the Southern District of New York. Case No. 1:13-cv-02311.

F. November 24, 2014. Expert Deposition.  *Thomas Geanacopoulos v. Philip Morris, USA*. Commonwealth Of Massachusetts Superior Court. Civil Action No. 98-6002-BLSI.

G. June 10, 2015. Expert Deposition.  *Michael J. Otto v. Abbot Laboratories*.  United States District Court, Central District of California. Case No. 5:12-CV-01411-SVW-DTB.

H. August 21, 2015.  Expert Deposition.  *Lynne Avram v. Samsung Electronics America, Inc. and Lowe's Home Centers*.   In the United States District Court for the District Of New Jersey. Civil Action No. 2:11-cv-6973 (KM) (SCM).

I. September 18, 2015.  Expert Deposition. *Scott Miller v. Fuhu, Inc. and Fuhu Holdings, Inc*. In the United States District Court of California, Western Division.  Case No. 14-cv-6119 CAS-AS.

J. November 9-10, 2015.  Expert Testimony at Trial.  *Thomas Geanacopoulos v. Philip Morris, USA*. Commonwealth Of Massachusetts Superior Court. Civil Action No. 98-6002-BLSI.

K. February 5, 2016.  Expert Deposition.  *Miner v Philip Morris Companies, Inc. and Philip Morris, Incorporated*.  In the Circuit Court of Pulaski County, Arkansas Sixth Division Case No. 60CV03-4661.

L. February 12, 2016.  Expert Deposition.  *Scotts EZ Seed Litigation*.  Case No. 12-CV-4727 (VB) (PED) (S.D.N.Y.).

M. March 8, 2016. Expert Deposition.  *Dzielak v Whirlpool*.  Case No. 12-cv-00090 (D.N.J.).

4

N. March 18, 2016.  Expert Deposition.  *Darisse v. Nest Labs, Inc*. Case No. 5:14-cv-01363. U.S. District Court of Northern California.

O. March 22. 2016.  Expert Testimony at Trial.  *Larsen (formerly Craft) v. Philip Morris*, Missouri Circuit Court, Twenty-Second Judicial Court.  Case No. 002-00406-02.

P. May 5, 2016.  Expert Deposition.  *Miner v Philip Morris Companies, Inc. and Philip Morris, Incorporated*.  In the Circuit Court of Pulaski County, Arkansas Sixth Division Case No. 60CV03-4661.

Q. August 29, 2017. Expert Deposition. *Jones et al. v. Nutiva*. Case No. 3-16-cv-00711-HSG. United States District Court for the Northern District of California.

R. October 17, 2017. Expert Deposition. *Brenner v The Procter & Gamble Co*. Case No.: 8:16-1093-JLS-JCG. United States District Court for the Central District of California.

S. October 23, 2017. Expert Deposition.  *Dean et al v Colgate-Palmolive Co*. Case No. 5:15-CV-00107. United States District Court for the Central District of California.

T. November 13, 2017.  Expert Deposition. *Joann Martinelli et al v. Johnson & Johnson and McNeil Nutritionals, LLC*. Case No. 2:15-cv-01733-JAM-DAD.  United States District Court, Eastern District of California.

U. November 21, 2017. Expert Deposition. *Strumlauf et al v Starbucks Corporation*.  Case No. 4:16-cv-1306-YGR.  United States District Court, Northern District of California.

V. December 11, 2017. Expert Deposition.  *In re: AMLA LITIGATION*.  Civil Action No. 1:16-cv-06593 (JSR). United States District Court, Southern District of New York.

W. January 19, 2018.  Expert Deposition. *Williams-Sonoma Song-Beverly Act Cases*. Superior Court of the State of California, County of San Francisco. Case No. JCCP 4611.

10. My current *curriculum vitae* is attached as Attachment A.

11. Plaintiffs' counsel has retained my services at the hourly rate of $400.  My compensation is not contingent on the results of my work or any outcome of the litigation.

## **SCOPE OF MY EXPERT REPORT**

12. I understand that Plaintiffs contend that Defendants misled Canada Dry Ginger Ale consumers by its use of the "Made from Real Ginger" claim in its labeling, advertising, and marketing. Plaintiffs contend that the "Made from Real Ginger" claim is false and misleading to consumers. Plaintiffs contend that consumers understood Canada Dry to have been made using ginger root, when in fact it was made using a flavor compound to mimic the taste of ginger root.  I understand from the Plaintiffs and from my review of Defendants' documentation that ██████████████████████████████████████████████████)



13. I was asked by Plaintiffs' counsel to design, conduct, and report on a reliable consumer survey to address issues relevant to the litigation.  I understood my scope to involve three measurements.   First, I was asked to measure how California Canada Dry Ginger Ale consumers understood the phrase "Made from Real Ginger".  Second, I was asked to measure whether the "Made from Real Ginger" claim is material to the purchasing decisions of California Canada Dry Ginger Ale consumers.  Third, I was asked to measure whether the "Made from Real Ginger" claim causes any price premium to be paid by California Canada Dry Ginger Ale consumers and if so, the amount of the premium.

**OVERVIEW OF WORK PERFORMED**

14. Based on my knowledge and expertise in the fields of survey research and consumer market research, I designed and conducted two surveys:  a consumer perceptions survey and a price premium survey. The consumer perceptions survey measures (i) consumers' understanding of the challenged "Made from Real Ginger" claim and (ii) the materiality of the challenged claim to consumers' purchasing decisions.  The price premium survey, as indicated by its name, measures the price premium, if any, that is attributable to the challenged claim.  The price premium survey also provides additional evidence of the extent to which the challenged claim is material to consumers' purchasing decisions.  I conducted the two consumer surveys in a number of sequential steps, as summarized here and further explained below.

---

[1] DPS_000076.

6

15. With respect to the consumer perceptions survey, I created a sampling plan designed to survey consumers whose responses would project to the study's target population of California consumers of Canada Dry Ginger Ale during the class period.  Second, I designed the survey based on my review of the Defendants' product packaging and market research, among other things.  Third, I tested the survey through cognitive interviews and pretesting with research subjects.  Fourth, I retained a survey vendor to program and execute the survey, as well as administer the survey to Canada Dry Ginger Ale consumers.  Fifth, I compiled the data from the completed interviews, reviewed the data to assess the quality of the survey data, and analyzed the interviews.

16. After conducting the consumer perceptions survey, I followed the same steps in conducting the price premium survey.  In addition, in designing the price premium survey, I considered supply-side factors and real-world market transaction information from consumer transaction data for the Defendants' products and for its competitors, which I obtained from my market scan of retail prices of ginger ale beverages sold in grocery, discount, and convenience surveys in the San Francisco Bay area and nationally, as well from market transaction data from IRI.[2]

17. I designed the price premium survey in consultation with plaintiff's damages expert, Mr. Colin Weir.  The data from my price premium survey provide a source of data for Mr. Weir to analyze and calculate the amount of economic damages suffered by class members that is specifically attributable to the challenged "Made from Real Ginger" label.

18. I designed and conducted the two consumer surveys in conformance with best practices for litigation surveys documented by Professor Diamond in her "Reference Guide on Survey Research."[3] My consumer survey employs a sound methodology, in light of the considerations documented by Robert Groves *et al.* in their survey research textbook, Survey Methodology (Second Edition), and by Peter Marsden and James Wright in the Handbook of Survey Research (Second Edition), among others.

19. In the paragraphs below, I first describe the methodologies and document the steps that I took to design and implement the surveys and then, at the end of my report, provide the findings from the two consumer surveys.

## METHODOLOGICAL CONSIDERATIONS FOR
## THE CONSUMER PERCEPTIONS SURVEY

20. The substantive consumer perceptions survey consisted of two batteries of survey questions: (i) the consumer understanding battery and (ii) the referendum battery.  The objective of the consumer understanding battery is to measure and understand how California Canada Dry ginger ale consumers interpreted the phrase "Made from Real Ginger" as it appeared on Defendants' product labels during the class period.  The objective of the referendum battery is to measure whether the "Made from Real Ginger" claim is material to the purchasing decisions of California Canada Dry Ginger Ale consumers.

21.  The methodology of the consumer understanding battery is based on the direct survey questionnaire technique common to marketing and public opinion research.[4]  The courts have accepted this methodology.[5]  Respondents are presented the stimuli, in this case an image of the Canada Dry Ginger Ale 12-pack packaging.  The survey instructs the respondents to view the product package like "you are shopping."  After having had an opportunity to view the product packaging, respondents are asked directly for their understanding of the statement "Made from Real Ginger" on the Canada Dry Ginger Ale.  The consumer understanding

---

[2] ██████████████████████████████████████████████████

[3] Shari Seidman Diamond, 2011, "Reference Guide on Survey Research," Reference Manual on Scientific Evidence (Third Edition).

[4] Directly asking respondents their understanding and opinions is a well-accepted and established methodology in marketing and survey research.  *See* Bradburn, N. M., Sudman, S., & Wansink, B. 2004. Asking Questions: A Practical Guide to Questionnaire Design. San Francisco: Jossey-Bass. *See* Groves, Robert M., Floyd J. Fowler, Jr., Mick P. Couper, James M. Lepkowski, Eleanor Singer, and Roger Tourangeau. 2011. Survey Methodology (Second Edition). John Wiley & Sons.  *See* Marsden, Peter V. and James D. Wright. 2010. Handbook of Survey Research (Second Edition).  Emerald Group Publishing. *See* Tourangeau, R., Rips, L. J., & Rasinski, K. 2000. The Psychology of Survey Response. Cambridge University Press.

[5] Courts have accepted the same direct-questioning technique in other litigation surveys that I have conducted in misleading advertising cases including *Price v. Philip Morris, Zill v. Sprint, Ebin v. Kangadis, Scotts EZ Seed Litigation,* and *Pettit v. Procter & Gamble [RE: Flushable Wipes]*.

question is shown below.  Respondents were provided a "None of these" option.  The substantive response options were randomized (e.g., each option would have a one-third chance of being top listed).

**Consumer Understanding Survey Question**



22. The referendum section of my survey is based on a well-established stated preference survey methodology, of which the use of referendum questions is central.  Courts have previously accepted my consumer surveys using the referendum question format.[6]   The approach was fully vetted in a U.S. government expert review entitled "The Report of the NOAA Panel on Contingent Valuation" (January 11, 1993), which is often called the "NOAA Blue-Ribbon Panel."  The Blue-Ribbon Panel was headed by two economists previously awarded the Nobel Prize in Economic Sciences, Kenneth Arrow and Robert Solow.  The referendum question format was regarded by the panel as having many advantages for measuring respondents' valuations of non-market goods compared to open-ended questions and other

---

[6] *See Price [Miles] v. Philip Morris*; *Zill v. Sprint*; *Ebin v. Kangadis Food Inc.*; *Sachs and Alden v. Toyota Motor Corporation*; *Avram v. Samsung Electronics America, Inc. and Lowe's Home Centers*; *Geanacopoulos v. Philip Morris, USA.*; *RE: Scotts EZ Seed Litigation*; *Dzielak v Whirlpool.*

formats.[7]   The NOAA Panel study is generally regarded by researchers as an affirmation of the reliability of the stated preference approach.  The NOAA Panel in its report and in its transmittal letter to NOAA's general counsel actually stated support for the approach.[8]   More than 7,500 academic papers, articles, books, and other studies that have been based on stated preference methodology, spanning 50 years and over 100 countries.[9]

23. **Study Target Population**.  The study target population for California consumer perception survey consisted of non-institutionalized U.S. adults age 18 and over who recently purchased Canada Dry Ginger Ale for their personal use.  To qualify for the consumer survey, respondents must answer a series of screening survey questions as shown in Attachment B. The screening questions are mapped to the definition of the study target population.  To qualify for the survey and be a study participant, the respondents must answer a series of questions whereby their responses meet all of the following conditions: be a U.S. resident; be at least age 18; did not take a survey about food and beverages in the past 30 days; purchases at least some of the groceries for their household; purchased for personal use bottled or canned carbonated soft drinks from a store in the past three months; and purchased for personal use Canada Dry Ginger Ale from a store (excluding purchases at restaurants) in the past three months.  Therefore, my sampling approach is based on surveying adult U.S. consumers who are actual and recent purchasers of Canada Dry Ginger Ale from stores for the consumer perceptions survey, or who are actual and recent purchasers of either Canada Dry or Seagram's ginger ales for the price premium survey.

24. The respondents completing the consumer perceptions survey represent a representative and diverse sample of Canada Dry Ginger Ale consumers.  50% of the respondents completing the survey began purchasing Canada Dry Ginger Ale more than 10 years ago and 89.5% began purchasing at least one year ago.  Most of the respondents were purchasers of regular

---

[7] My survey created a hypothetical marketplace in consumers had the option to state a preference for the actual marketed good ███████████████████████████████████████████ and the non-market good ██████████████████████████████████████████ ███████████

[8] The report and transmittal included this statement:  "CV [contingent valuation] studies can produce estimates reliable enough to be the starting point for a judicial or administrative determination of natural resource damages-including passive use values."

[9] Richard Carson, 2011, Contingent Valuation:  A Comprehensive Bibliography and History.

(non-diet) Canada Dry Ginger Ale (81.2%); 18.8% usually purchase diet Canada Dry Ginger Ale.  Common to consumer surveys regarding food and beverages (and to the actual makeup of persons with primary responsibility for grocery shopping), more of the respondents are female (63.3%).  The age distribution reflects the diversity of the California consumer:  30% were age 18 to 34; 33.6% were age 35 to 54; 34.5% were age 55 to 74; and 1.9% are age 75 or older.

25. **Cognitive Interviews**.  While developing the questionnaire for the consumer perceptions survey, I conducted seven cognitive interviews with ginger ale consumers on February 25, 2018.  The typical interview lasted 20 to 35 minutes.  The purpose of the cognitive interviews is to collect feedback from test respondents to determine if the questionnaire is clear and understandable to the respondents.  I showed the respondents the online survey questionnaire from my computer by sharing my computer screen while talking with them over the phone or through their computers (i.e., voice over IP).  Respondents provided me feedback on the survey as I showed them each online screen.  I showed the respondents the screening questions and the consumer understanding and referendum batteries of survey questions.  Based on feedback from the respondents, I made some modest changes to the survey as evidenced by a comparison of Attachment C (questionnaire used for the cognitive interviews) and Attachment B (questionnaire for the pretest survey and main study).  Those changes are noted below.

   a. Screening Question S1 on "bottled or canned beverages":  I added the response option "Beer or wine."

   b. Screening Question S2 on types of carbonated soft drinks:  I added the response option: "Cola (any store brand)."

   c. Screen REFERENDUMintro4:  Clarified the instructions to the respondent and introduced the "Made from Real Ginger" claim.

   d. Screen REFERENDUMintro5:  Simplified the descriptions of the ginger root and ginger oleoresin ingredients, removing language regarding specific types of solvents.

   e. Screen REFERENDUMintro6:  Simplified the descriptions of the ginger root and ginger oleoresin ingredients to be consistent with the changes in REFERENDUMintro5.

    f.   Consumer Understanding Question Consumer:  Simplified the descriptions of the ginger root and ginger oleoresin ingredients to be consistent with the changes in REFERENDUMintro5.  Clarified the survey question to refer to "understanding" instead of "expectation" of the product package.

    g.   Removed the survey question measuring consumers' perception of the quantity of ginger root in the product.

26. **<u>Pretest Survey</u>**.  I conducted a pretest to test the consumer survey with a representative sample of members of the study target population.  The pretest survey is, in a sense, a dress rehearsal for the data collection.  The pretest was conducted online using the same sampling and data collection procedures that I subsequently employed for the full data collection.  I conducted the pretest for the following purposes: (i) for quality control and quality assurance testing of the survey instrument, (ii) to validate that the survey questionnaire was programmed correctly to my specifications, (iii) to identify any survey questions that were unclear to respondents, and (iv) to analyze the data to identify any problems, such as unexpected missing data.  On March 2, 2018, I completed 103 interviews with pretest respondents.  I paused the data collection so that I could review the collected survey interviews.

27. Based on my review of the pretest data, I determined that no questionnaire wording changes were warranted. Under my direction, data collection resumed on March 3, 2018.  I did not make any survey question wording changes to the survey questionnaire based on the pretest or prior to conducting the full study.  Therefore, since the pretest survey and main study questionnaires are identical in survey question content, I included the pretest survey interviews in the final data set on which I rely for my analysis and reporting of findings. This is a customary practice in the survey research industry. The data collection was completed on March 6, 2018.

28. **<u>Details on Sample Performance</u>**.  There were 2,311 California residents identified at the beginning of the survey.  Of these California residents, 420 respondents qualified for the survey by meeting the definition of the study target population.  Of these, there were 415 California Canada Dry Ginger Ale consumers that completed my consumer perceptions survey.  Of these 415 respondents, 204 were assigned to and completed the consumer understanding section of the survey, and 211 were assigned to and completed the referendum

battery of survey questions.  By collecting at least 200 interviews of Canada Dry Ginger Ale consumers for both the consumer understanding and referendum batteries, I collected sufficient sample size to generalize my survey results to California Canada Dry Ginger Ale consumers.[10]  Furthermore, I am confident in the statistical precision of my survey results since the survey results themselves are in the 78% to 92% range (rather than approximately 50%).  Keeping the number of completed interviews the same, the statistical precision of the survey results improves the more the survey result is less than or greater than 50%.[11]

29. **Survey Questionnaire Programming and Survey Data Collection**.  I retained Research Now Survey Sampling Inc. (RNSSI) to provide me with the online survey vendor services for programming the questionnaire, providing the respondent sample, and for collecting the survey data.  Based on my experience in the industry (as described above), the RNSSI online panel sample is regarded as the most credible and reliable non-probability online panel having the necessary scale for this study, which involves collecting a substantial number of interviews on a relatively low-incidence consumer segment.  RNSSI programmed my survey questionnaire into an online survey under my active supervision.  The actual survey data were collected using survey software and servers operated by RNSSI.

30. **Steps Taken to Disguise Survey Objectives from the Respondents**.  I took certain steps to avoid a potential risk for the reliability of the study that would result from respondents answering the survey questions strategically to either help or hurt Defendants' interests.  I camouflaged the survey objectives to address the risk of strategic responses.  First, with respect to the screening section of the survey, my first screening question included a wide variety of beverage product types.  Second, I included in the survey a broad assortment of carbonated soft drink brands.  By casting a wide net for the types of beverages and carbonated soft drinks listed in my survey questions, I disguised the research objectives from the respondents.  From my cognitive interviews with respondents, I understand that these questions effectively disguised the survey objectives.  I asked respondents at the end of my cognitive interviews about their opinion regarding which organization or type of organization

---

[10] Bryan Orme, 2010, "Sample Size Issues in Conjoint Analysis."  The rule of thumb of having at least 150 to 200 or more interviews applies to both conjoint surveys and surveys based on direct questioning.

[11] Leslie Kish, 1965, <u>Survey Sampling</u>. Wiley & Sons.

is paying for the study.  Respondents perceived that the survey was part of a market research study being conducted by a market research company.

31. **Randomizations in the Survey to Control for Potential Order Effects.**  I made extensive use of randomizations in the survey questionnaire to control for the potential impact on survey responses that could result from the order in which respondents are asked to answer certain questions or exposed to stimuli (images) in my survey.   The randomizations are documented in Attachment B where I show the logic programmed into the online survey. Randomizations include, but are not limited to, the following, survey questions and batteries of survey questions.

   a. The respondents eligible for the survey were randomly assigned to either the referendum battery or consumer understanding battery of survey questions.  The goal was to eliminate the possibility that exposure to the consumer understanding questions could condition the respondents answering the referendum questions, or vice versa.

   b. RE:  Randomization of the descriptions for "Ginger Ale A" and "Ginger Ale B" for the referendum question.  Respondents were randomly assigned to a "Ginger Ale A" that is made using either "ginger root" or "ginger oleoresin," while "Ginger Ale B" would, of course, have the other description.  The goal is to control for the possibility that respondents might perceive that Ginger Ale "A" is somehow more valuable than Ginger Ale "B."

   c. RE:  Randomization of the order of the attributes in the referendum question, with the exception of keeping "Brand" on the top of the table and keeping these two attributes next to each other:  Statement on Package about Ginger; Statement on Package about Flavor.

   d. RE: QCONSUMER, QMATERIAL1, and QMATERIAL2.  Randomized the order of response lists in the survey.

## DESCRIPTION OF THE SUBSTANTIVE CONSUMER PERCEPTIONS SURVEY QUESTIONNAIRE

32. The survey question wording and survey logic are documented in Attachment B, while Attachment D shows the actual images from the online survey that the respondents

completed.  Below I provide additional information on the considerations in designing each of the substantive survey questions for measuring consumers' understanding of the "Made from Real Ginger" claim and for measuring any price premium solely attributable to the claim.  I shall first describe the consumer understanding section of the survey and then describe the referendum battery.

33. After the completion of the screening questions, which are fully set out in Attachment B, the consumer understanding section of the survey begins with a simple introduction and reassurance that there are "no wrong answers."

**First Screen in the Consumer Understanding Section of the Survey**



34. The second screen instructs the respondent to "take your time to view the product package like you are shopping" and informs the respondent that "we will ask you to answer questions based on your understanding of the product package."  The survey language is customized to reflect respondents' answers to a previous question about whether they usually purchase "regular" or "diet" ginger ale.

**Second Screen in the Consumer Understanding Section of the Survey**



35. The third screen is the display of the Canada Dry Ginger Ale product packaging. Respondents previously indicating that they usually purchase "regular" ginger ale are shown the regular 12-pack box of Canada Dry Ginger Ale.  Respondents previously indicating that

they usually purchase "diet" ginger ale are shown the regular 12-pack box of Canada Dry Diet Ginger Ale.   Below is the display shown to the "regular" ginger ale purchasers.

**Third Screen in the Consumer Understanding Section of the Survey**



36. The final screen of the consumer understanding section is the substantive survey question. Respondents had the option to click on the 12-pack product image that was shown to them on the previous screen.  Respondents had the option to select "None of these" if none of the three substantive response options were consistent with their understanding of the statement "Made from Real Ginger" on the Canada Dry Ginger Ale.  The three response options were presented in random order. I included the "ginger oleoresin" and "ginger oil" response options because they were cited as common ginger flavoring ingredients in a manual on ginger processing prepared for the U.S. government.[12]  The description of ginger oleoresin is based on a 2017 manual prepared for the U.S. Agency for International Development entitled

---

[12] The 2017 manual "Ginger Processing to Oleoresin – An Industry Wide Study Report" was prepared by Romis Consultants, Ltd. and submitted to USAID in April 2017.  The ginger oleoresin extraction process is described on pages 13-19.  The manual explains that "extraction is undertaken with the help of proper solvent. Solvents that can be used are hexane, acetone, ethylene dichloride, or alcohol. Extraction is done by percolation of the solvents at room temperature through a bed of ground spice packed in a SS percolator" (p. 16). ███████████

"Ginger Processing to Oleoresin – An Industry Wide Study Report."  The "ginger oil" option is based on the same 2017 manual and also from an explanation from a manufacturer of ginger oil.[13]  I included ginger oil because my background research had indicated that respondents might understand ginger oil as an ingredient in ginger ale and because ginger oil. This is the final substantive screen in the survey.  Respondents were then shown a "thank you" screen after answering this question.

**Fourth and Final Screen in the Consumer Understanding Section of the Survey**



Based on your understanding of the product package we showed you, what is your understanding of the statement *"Made from Real Ginger"* on the Canada Dry Ginger Ale?

Please select the option that is closest to your understanding. Please click on the product to view again.

The ginger ale is made using ...

| |
|---|
| **Ginger oil**, which is extracted from the ginger root using steam |
| **Ginger root**, which is part of the ginger plant, not an extract |
| **Ginger oleoresin**, which is extracted from the ginger root using a solvent |
| None of these |

37. As mentioned, half of the respondents were randomly assigned to the referendum battery of survey questions.  There are actually only two survey questions in the referendum battery. However, there are several information provision screens shown the respondents to provide the necessary context for the two substantive questions.  The context setting is required, as in other stated preference surveys, to establish the hypothetical choice context for the respondents.  Examples of the information provisions screens are shown below.  All of the screens are shown in Attachment D.

---

[13] AGICO Group explains that "Ginger oil extraction has two ways: steam distillation and solvent extraction. Solvent extraction is for the extraction of ginger oleoresin, while steam distillation is used to get ginger essential oil."  *See* http://www.gcmachines.com/ginger-oil-extraction.html.

**Information Provisions Screens Prior to the Referendum Question**

---

60%

Suppose you go to the store where you usually purchase ginger ale and you intend to buy regular (non-diet) Canada Dry Ginger Ale.

>

---

61%

Suppose there are two types of Canada Dry Ginger Ale available in the store.

We'll call them Ginger Ale **A** and Ginger Ale **B**.

You don't have time to go to a different store.

---

63%

Ginger Ale **A** and Ginger Ale **B** are the same in these ways.

- Brand
- Price
- Regular Soft Drink (not diet)
- Number of Calories per 12-ounce serving
- Number of 12-ounce cans or bottles

---

65%

Ginger Ale **A** and Ginger Ale **B** also share the same packaging and the same statements about the ginger ingredient and flavor. The statements are:

*Made from Real Ginger*

*100% Natural Flavors*

Please take your time to view the product on the next screen like you are shopping.

Later we will ask you to answer questions based on your understanding of this product package.

The one difference between the two products is about the ginger ingredient mentioned in the statement *"Made from Real Ginger"* on the package.

One of the ginger ales is made using **ginger root**, and the other ginger ale is made using **ginger oleoresin**.

- **Ginger root** is part of the ginger plant, not an extract.

- **Ginger oleoresin** is extracted from the ginger root using a solvent such as ethanol. Then evaporation is used to remove most of the solvent.



Ginger Ale **A** is made using **ginger root**, which is part of the ginger plant, not an extract.

Ginger Ale **B** is made using **ginger oleoresin**, which is extracted from the ginger root using a solvent.

38. After the information provision screens, the respondents were then asked the referendum question.  To avoid any doubt by what I mean in referring to the "referendum question," below is the actual referendum in my survey. After the respondents are informed that Ginger Ale A and Ginger Ale B are the same except for that one is made using ginger root and one is made using ginger oleoresin, the respondents are asked which one they would purchase. Respondents had the option to select "Don't Know."  Respondents had the option to view again the image of the 12-pack package.  After answering the referendum question by selecting Ginger Ale A or B, respondents were asked to confirm or not confirm their answer. Respondents not confirming their answer were given the opportunity to change their answer to the referendum question.  There was only one respondent that did not confirm.

**Referendum Question in the Consumer Perceptions Survey**



| Product Features | Ginger Ale A | Ginger Ale B |
|---|---|---|
| Brand | | |
| Price | Same | Same |
| Statement on Package about Ginger | Made from Real Ginger | Made from Real Ginger |
| Statement on Package about Flavor | 100% Natural Flavors | 100% Natural Flavors |
| Calories per serving | Same | Same |
| Number of 12-ounce cans or bottles | 12 | 12 |
| Diet or Regular Soft Drink | Regular | Regular |
| Ginger Ingredient | Ginger root | Ginger oleoresin |
| Please select one for purchase | Ginger Ale A | Ginger Ale B |

If these were your only two options, which of these two ginger ales would you purchase?

Click HERE to see the package again.

Don't Know

39. Respondents selecting the ginger root beverage were then asked a follow-up question about whether the consumers are more or less likely to purchase Canada Dry Ginger Ale because "Made from Real Ginger" means the beverage is made using ginger root instead of ginger oleoresin.[14]  The question measures whether respondents' stated preference for the ginger root beverage with the challenged claim is material to their purchasing decision.  The question is shown below.  This was the final substantive survey question for the respondents.

---

[14] The nine respondents stating a preference for the ginger oleoresin beverage were shown the same follow-up question except the survey question acknowledges the respondents' preference for a ginger oleoresin ginger ale.

20

## METHODOLOGICAL CONSIDERATIONS FOR
## THE PRICE PREMIMUM SURVEY

40. **Study Target Population.**  The definition of the study target population for the price premium survey is the same as the definition I employed for the consumer perception survey, with the exception that I broadened the respondent pool slightly for the price premium survey to include respondents who had purchased either Canada Dry or Seagram's ginger ales in the past 12 months.

41. **Conjoint Survey Methodology**. The price premium survey uses the Choice-Based-Conjoint methodology utilizing the Sawtooth software system for online data collection.  (For the purposes of my declaration, I use interchangeably the expressions "price premium survey" and "conjoint survey.")  Choice-based conjoint is the most widely used type of conjoint.[15] Since at least the 1990s, conjoint surveys have been a generally accepted and commonly used tool in market research to estimate market demand for new products and services, among other purposes.[16]  Specifically, choice-based conjoint is a standard marketing research

---

[15] Sawtooth Software, 2013. The CBC System for Choice-Based Conjoint Analysis Version 8.

[16] Green, Paul E. and V. Srinivasan, 1990. Conjoint Analysis in Marketing Research: New Developments and Directions. Bryan Orme, 2010.

technique for quantifying consumer preferences for products and for the component features that make up a product.[17]  Conjoint analysis can be used to break down the utility of a conceptual feature into its component parts.  My use of the conjoint methodology is to measure the marketplace price premium attributable to the challenged "Made from Real Ginger" claim. Conjoint surveys are used widely in industry and government.[18]  Conjoint is a widely accepted by the courts as a reliable methodology.[19]

42. Prior to the adoption of choice-based conjoint in marketing research, it was common for researchers to ask respondents to rank and rate new product concepts and features.  Choice-based conjoint, in contrast, asks the respondent to express their preferences by choosing from sets of concepts (such as product profiles).  As such, the respondent experience in answering

---

[17] See generally, the Sawtooth Software technical papers on choice-based conjoint available at http://www.sawtoothsoftware.com/support/technical-papers.

[18] While conjoint surveys have been common on market research since 1990s for product development and other purposes, it is increasingly used in the public sector.  For instance, the Food and Drug Administration uses the approach in regulatory benefit-risk assessments.  (F. Reed Johnson and Mo Zhou, 2016, "Patient Preferences in Regulatory Benefit-Risk Assessments: A US Perspective).  In another example, public health planners are increasingly using choice-based conjoint to collect public input in health service planning, healthcare finance debates, and the treatment choices of individual patients, among other uses. Charles E. Cunningham, Ken Deal, and Yvonne Chen, December 2010, "Adaptive Choice-Based Conjoint Analysis: A New Patient-Centered Approach to the Assessment of Health Service Preferences."

[19] See, e.g., Dzielak v. Whirlpool Corp., 2017 WL 1034197, at *6-8 (D.N.J. Mar. 17, 2017) (finding related methodology "passes muster under the Daubert considerations," including its "relationship to other established reliable techniques (particularly, the conjoint analysis technique of which it is a part)"); In re: Lenovo Adware Litig., 2016 WL 6277245 (N.D. Cal. 2016) (certifying class where damages model was based on conjoint analysis); In re ConAgra Foods, Inc., 90 F. Supp. 3d 919, 1027-31 (C.D. Cal. 2015) (concluding an expert's "conjoint analysis is, at this stage, sufficiently reliable to be used in calculating class-wide damages"); Guido v. L'Oreal USA, Inc., 2014 WL 6603730, at *4-8 (C.D. Cal. 2014) (collecting cases and finding conjoint analysis satisfied class certification requirements of Comcast); TV Interactive Data Corp. v. Sony Corp., 929 F. Supp. 2d 1006, 1020-26 (N.D. Cal. 2013) (denying motion to exclude conjoint analysis) Microsoft Corp. v. Motorola, Inc., 904 F. Supp. 2d 1109, 1119-20 (W.D. Wash. 2012) (conjoint analysis survey was "admissible as relevant under FRE 401 and 402 and . . . sufficiently reliable under FRE 702 and Daubert").

choice-based conjoint surveys is similar to what buyers actually do in the marketplace -- that is, choosing a preferred product from a group of products.

43. I designed the conjoint survey to provide the respondents (i) the appropriate decision-making context for answering the choice questions, (ii) instructions for how to compare the product profiles and answer the choice questions, and (iii) clear descriptions of the attributes themselves.  The conjoint survey I designed and implemented for this study, in my expert opinion, is relatively simple and cognitively easy for respondents compared to standard market research conjoint surveys.  The basis for this opinion is as follows:

- The survey sample was restricted to actual recent purchasers of ginger ale. The interviewed respondents had recently experienced making ginger ale purchases. Therefore, the conjoint survey had personal relevance to the respondents.

- Typical conjoint surveys can have six or more attributes for the respondents to consider.  My survey has only six.

- Some conjoint surveys will present four product profiles for each choice task.  My survey provides only three, which reduces the cognitive burden on the survey respondent and generally makes it easier for the respondent to process the presented product choices.

- Conjoint surveys often have 12 to 20 choice tasks for the respondent to consider and decide which products they prefer.  My survey is on the low end of the usual range with only 10 choice tasks for each respondent.  The result is more reliable data since there is less potential for respondents to experience fatigue in answering the choice questions.

- Respondents were provided a "None of these" option in the conjoint survey; therefore, respondents were not forced to select one of the three product profiles. Respondents not having a preference for a ginger ale beverage presented to them in the conjoint survey had the option to select "None of these."

44. In determining which attributes to include in the conjoint survey, I considered the information collected during my qualitative research with ginger ale purchasers in designing the survey.  I also considered Defendants' market research that demonstrated that brand and other attributes are significant drivers of consumer behavior.[20]

---

[20] Deposition transcript of David Falk, February 23, 2018.  Defendants' market research is cited in my list of considered materials.

45. In designing the conjoint survey, I considered and included numerous real-world supply-side factors for the products at issue, so that my survey would accurately measure the price premium attributable to the challenged claim, i.e., the intersection between demand-side factors (willingness to pay) and supply-side factors (willingness to sell), to determine the actual effect of the challenged claim on market price.  I took into account the fact that this product is sold in a well-developed, longstanding, and competitive market, through a variety of retail outlets.  My price premium survey included market-based price points for the 2-liter and 12-pack price attribute based on actual real-world prices that consumers have paid for the products.  The actual real-world pricing of the products reflects the actual number of units sold, the costs of manufacturing, the costs for distribution, advertising, and marketing, and margin, among other supply-side factors.  My price premium survey also incorporates other market-based attributes besides price, such as actual competing products in the marketplace identified by the Defendants.  I used real logos, product photos and actual wording of label claims and nutrition fact claims from these competing brands in the survey. Further, I took into account the fact that the quantity supplied of the Defendants' and competitors' ginger ale products is a known fact and is fixed as a matter of history.

46. Other sources of information that I considered in designing the conjoint survey include the following:  advertised pricing and actual retail and wholesale transaction data for the Defendants' products and the products of its competitors; [21] a market scan of the leading brands of ginger ale available for purchase online and in brick-and-mortar retail stores; and the Defendants' and competitors' product labels used during the class period, among other things.

47. The conjoint survey design that I designed and implemented is based on certain "levels" within the attributes.  To define terms, an "attribute" is a feature type such as brand, price, or a label on the product package.  A "level" is one of the options for an attribute.  For instance, "Canada Dry" is a level for the brand attribute, while "Diet" is a level for the attribute of the drink type.  Each attribute in the conjoint survey has two or more levels.  The attributes and

---

[21] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

levels use in the conjoint survey are shown below for the 2-Liter and 12-pack versions of the price premium survey.

**Attributes and Levels for the Price Premium Survey**

| ATTRIBUTES | LEVELS |
|---|---|
| **BRAND** | Canada Dry |
| | Seagram's |
| | Schweppes |
| | Vernors |
| **TYPE** | Diet |
| | Regular |
| **FLAVOR** | Ginger Ale |
| | Black Cherry Ginger Ale |
| | Cranberry Ginger Ale |
| | Grape Ginger Ale |
| | Lemon Lime Ginger ale |
| | Raspberry Ginger Ale |
| **NUTRITION FACTS** | The Nutrition Facts image for each brand, product size (2 Liter and 12 pack), and type (diet/regular) |
| **DESCRIPTIONS ON FRONT OF PACKAGE** | Made from Real Ginger |
| | Made with Real Ginger |
| | Caffeine Free |
| | 100% Natural Flavors |
| | The Original Ginger Soda |
| | Since 1904 |
| | Since 1783 |
| | Barrel Aged |
| **PRICE (FOR THE 2-LITER PRODUCT)** | $1.00 |
| | $1.50 |
| | $2.00 |
| | $2.50 |
| | $3.00 |
| **PRICE (FOR THE 12-PACK PRODUCT)** | $3.00 |
| | $4.00 |
| | $5.00 |
| | $6.00 |
| | $7.00 |

48. In the actual choice tasks, respondents are shown three different product profiles from which to make a selection (and also provided a "none of these" option).  Each product profile is distinguished by the combination of attributes and levels.  While each product profile has the same list of attributes, the actual levels for each attribute are randomly displayed (with some documented constraints).  Therefore, the respondent is making selections based on comparing different profiles of ginger ale products that vary by price points, brand, nutrition facts, type, flavor, and product descriptions.  Below is an example of a choice task for a respondent.

**Example of a Choice Task for a Respondent in the Price Premium Survey**

If these were your only options at the store, which of these 2-Liter bottles of GINGER ALE would you purchase in real life?

(1 of 10)

| Feature | Ginger Ale A | Ginger Ale B | Ginger Ale C |
|---|---|---|---|
| Brand | Seagram's | CANADA DRY | Vernors |
| Type | Regular | Regular | Diet |
| Flavor | Lemon Lime Ginger ale | Ginger Ale | Black Cherry Ginger Ale |
| Nutrition Facts | Click here | Click here | Click here |
| Descriptions on Front of Package | • Made with Real Ginger<br>• Caffeine Free<br>• Since 1904<br>• 100% Natural Flavors | • The Original Ginger Soda<br>• Since 1904 | • Made from Real Ginger<br>• The Original Ginger Soda<br>• Caffeine Free<br>• Barrel Aged |
| Price | $2.00 | $1.50 | $2.50 |
| Select one for purchase | ⊙ | ⊙ | ⊙ |
| Would buy none of these | | ⊙ | |

49. By making a series of choices across 10 choice tasks, the respondent reveals the utility of the attributes (e.g., price sensitivity, loyalty to a specific brand, appeal of specific claims on labels, etc.).  The elegance of the conjoint design is that it encourages respondents to make decision trade-offs in considering various combinations of attributes and levels (for instance, by weighing their loyalty to a specific brand versus their sensitivity to price). Below are specific notes on each attribute.

50. To inform the questionnaire design, I conducted two rounds of one-on-one cognitive interviews with ginger ale consumers.  On March 11, I conducted six cognitive interviews

lasting approximately 30 minutes on average.  This was formative research to inform my development of the attributes.  On March 17, I conducted five additional cognitive interviews with ginger ale consumers.  For this survey, I showed the respondents the draft attributes.  I learned from the cognitive interviews that I should make clear the survey is not about ginger beer.  At my probing, I also received feedback from some respondents that they would prefer to be able to read the nutrition facts label.  I incorporated the feedback into the survey by clarifying the survey make clear that the survey questions are not about ginger beer.  I also added images of the nutrition facts to the survey in two places:  during an information provision screen prior to the choice tasks, and within the choice tasks itself.  In total, sixteen nutrition fact labels were made available to respondents corresponding to the possible combinations of four brands by two product sizes (2 Liter and 12 packs) by two types (regular and diet).  Because the nutrition facts are too large to display inside the choice task, I made them available to the respondents during the information provision and by clicking on hyperlinks in the choice screens.  Clicking on a link to view nutrition facts also replicates the experience of shopping in a store, which requires a customer who wishes to view nutrition facts to take the product off the shelf and look at the back or side panel.  An example of such a choice task with pop-up nutrition facts label is shown below.  The choice task itself is momentarily darkened so that the respondent can view the nutrition facts and easily return to the survey.

**Example of a Choice Task with a Pop Up of Nutrition Facts**



51. As explained above, based on careful research, I designed my survey to include the attributes that are important to ginger ale consumers in making purchasing decisions. All important attributes were included in my price premium survey, in my expert opinion. The survey questionnaire for the price premium survey is Attachment E. The online screen captures for the price premium survey is Attachment F.

52. With respect to the number of price premium interviews I collected, I exceeded industry best practices by having 804 California Ginger Ale consumers completing my price premium survey. Industry guidelines recommend having at least 150 respondents participating in the conjoint survey and preferably having at least 200 completed interview per group. Sawtooth

recommends having at least 300 interviews for robust quantitative research.[22]   I had 401 California Ginger Ale consumers completing the 2-Liter conjoint survey and 403 California Ginger Ale consumers completing the 12-pack conjoint survey.

## METHODOLOGY FOR THE PRICE PREMIUM ANALYSIS

53. I conducted the analysis of the conjoint data using a market simulation tool produced by Sawtooth Software, the industry leader in market research for conjoint data collection and analysis software.  Sawtooth's authors explain that:

> the simulator is used to convert raw conjoint (partworth utility) data into something much more managerially useful: simulated market choices. Products can be introduced within a simulated market scenario and the simulator reports the percentage of respondents projected to choose each product. A market simulator lets an analyst or manager conduct what-if games to investigate issues such as new product design, product positioning, and pricing strategy. Market simulators are commercially available or can be constructed using spreadsheet programs.[23]

54. In short, a market simulation tool is a "choice laboratory" for testing multiple real-world possibilities (e.g., the price premium paid estimates for products with and without the challenged claims) and supports the estimation of preferences across consumer segments.

55. With respect to the analysis tools needed to analyze the survey data, the raw data created by a conjoint survey is fundamentally different from a non-conjoint survey data obtained through a direct-questioning methodology that is typical in a marketing or public opinion survey.  In a conventional survey data set, survey answers such as "yes" and "no" are coded into "1" and "2," making possible a straightforward count of survey responses.  No "modeling" of the data is required to draw inferences.  In contrast, a conjoint study leads to a set of utilities or part-worths that quantify value respondents' place on each level of each attribute (e.g., for each price level for the price attribute).  To draw inferences from the utility data, conjoint analysis

---

[22] Bryan Orme, 2010, "Sample Size Issues in Conjoint Analysis." https://www.sawtoothsoftware.com/download/techpap/samplesz.pdf.

[23] Bryan Orme, Sawtooth Software, on "Market Simulators for Conjoint Analysis." https://www.sawtoothsoftware.com/download/techpap/introsim.pdf. Also, Joel Huber et al., 2006. Dealing with Product Similarity in Conjoint Simulations.

leverages Bayesian statistics (technically, Hierarchical Bayesian modeling) to provide individual respondent-level models. The price premium survey results presented in my declaration are calculated using a market simulator employing Hierarchical Bayesian models developed in the Sawtooth Software system.[24] RNSSI, the survey vendor that programmed my conjoint survey and collected the data from its online panel, created the market simulator under my direction using the Sawtooth software.

56. The market simulation provides a statistically robust estimate of the price premium that purchasers paid as a result the challenged "Made from Real Ginger" as a fraction of the total price of the Canada Dry Ginger Ale product. For instance, a price premium of 10% for a challenged claim on the Ginger Ale product sold for $2.00 is the same as stating that $0.20 of the product price is attributable to the premium paid for the challenged claim. In this example, the purchaser would need to be presented a 10% discount in order for the product without the challenged claim to have the same market value as the product with the challenged claim.

57. The design of my conjoint survey and my market simulator allowed me to calculate the price premium attributable to the challenged label for the marginal consumer, that is, the additional price that the marginal consumer would pay for the product with the "Made from Real Ginger" claim. As explained by Nobel Prize winner Daniel McFadden and his co-authors, the price premium of the "infringing feature" (in this case, the challenged "Made from Real Ginger" claim) is the same as the willingness to pay of the marginal consumer that can be identified by offering respondents a "no buy" option in the conjoint survey.[25] I provided respondents such a "no buy" option in the form of a "none of these" option in the choice sets shown the respondents in the price premium survey. By using this procedure, and by further taking into account the supply-side factors as discussed above, I identified the marginal consumer as a ginger ale consumer who is indifferent between the market price of the Canada Dry Ginger Ale with the "Made from Real Ginger" claim and the same product

---

[24] Sawtooth Software Technical Paper Series, 2009, "The CBC/HB System for Hierarchical Bayes Estimation." Sawtooth Software Technical Paper Series, 2017, "The CBC System for Choice-Based Conjoint Analysis."

[25] Lisa Cameron, Michael Cragg and Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," Law360, October 16, 2017.

without the challenged claim having a 4% discount.

58. To produce reliable and conservative estimates of value, I purposely made an analytical assumption that results in minimum estimates of the price premium paid as a result of the challenged claim. In particular, I selected the lowest percentage price premium that is returned by the simulation, which also corresponds to the most expensive price points in the market simulation: $3.00 for the 2-Liter product and $7.00 for the 12-pack product. These two price points are the most expensive price points tested in the price premium survey and are substantially higher than indicated by the average retail pricing data made available to Mr. Weir and myself; they represent the high end of price points observed by my market scan of retail prices.[26] Because consumers as economic actors are sensitive to the price (with lower valuations for the product as the price increases), using the highest price points available for the market simulation produces conservative, minimal estimates of the price premiums. Therefore, I have made the conservative adjustment in my reporting of the price premium by using the highest price point shown the respondents in my price premium survey.

59. For the below-presented price premium statistics, I used the following assumptions in the market simulation to produce conservative, minimum price premium statistics that are generalizable to the Defendant's products purchased by the class.

   a. Sample is restricted to California Ginger Ale purchasers only, per the definition of the class.

   b. Respondents are given the choice of two different ginger ale products to purchase or to select "None of these." Consumers had the option to not make a choice of which of the two products they would purchase.

   c. The product profiles for the two available products differ only in the presence or absence of a challenged claim "Made from Real Ginger."

   d. The product profiles for the two available products are the same with respect to the attributes:

---

[26] My market scan of San Francisco-area retailers shows a price range of $1.89 to $2.19 for the 2-Liter Canada Dry Ginger Ale, with an outlier of $3.00 at an inner-city convenience store. My market scan for the 12-pack (12 oz. cans) shows a price range of $4.99 to $6.99.

    i.   Price (e.g., $3.00 for the 2-Liter product, $7.00 for the 12-pack product). These two price points are selected to provide conservative, minimum price premium statistics.

    ii.   Brand is Canada Dry, per the definition of the class consisting of Canada Dry consumers.

    iii.   Type is Regular (non-diet).  This is the most frequently purchased type of ginger ale made by the Defendants.

    iv.   Flavor is Ginger Ale (not one of the ginger ales with additional flavor such as cranberry). Ginger Ale is the most frequently purchased flavor of ginger ale made by the Defendants.

    v.   Non-challenged claims that appear on the Canada Dry Ginger Ale products: "Caffeine Free," "100% Natural Flavors," and "Since 1904." These are the actual other claims on the Canada Dry products in addition to "Made from Real Ginger."

60. My price premium statistics, which are based on the above-noted assumptions in the market simulation, are accurately generalizable to all the Defendants' ginger ale products including diet and ginger ales with added flavor.   Indeed, they provide a conservative, minimum estimate of the price premium paid by the class for the Canada Dry Ginger Ale "Made with Real Ginger" phrase.  The price premium statistics are not statistically different when excluding the Seagram's only purchasers from the analysis or when excluding respondents spending less time completing the survey (i.e., 5th percentile or lower).  The price premium statistics are not statistically different when simulating diet-type ginger ale instead of regular ginger ale.  The price premium statistics are significantly higher when using the simulation for the flavors for ginger ale that have other added flavors (e.g. cranberry).  Hence, basing the price premium on the ginger ale (no added flavor) is the conservative methodology.

## FINDINGS FROM THE CONSUMER SURVEYS OF CALIFORNIA GINGER ALE CONSUMERS

61. My survey found that a substantial majority – 78.5% – of California Canada Dry Ginger Ale consumers understand the "Made from Real Ginger" claim to mean that the beverage is made using "ginger root, which is part of the ginger plant, not an extract."  By contrast, 4.8%

understood the claim to mean the beverage is made using "ginger oleoresin, which is extracted from the ginger root using a solvent" and 8.6% understood the claim to mean the beverage is made using "ginger oil, which is extracted from the ginger root using steam." The overwhelming majority of consumers, therefore, had an understanding that the "Made from Real Ginger" claim means that the Defendants' beverage is made using ginger root from the ginger plant, and is not made using ginger oil or ginger oleoresin extracted from the ginger root.

**Survey Result:  Consumers' Understanding of the "Made from Real Ginger" Claim**[27]

| Responses | No. Respondents | Percent |
|---|---|---|
| Ginger root, which is part of the ginger plant, not an extract | 164 | 78.5%[28] |
| Ginger oil, which is extracted from the ginger root using steam | 18 | 8.6% |
| Ginger oleoresin, which is extracted from the ginger root using a solvent | 10 | 4.8% |
| None of these | 17 | 8.1% |
| Total | 209 | 100.0% |

62. My survey also found that 92.4% of consumers prefer to purchase a version of the Defendants' product labeled "Made from Real Ginger" that is described as made using ginger root over a version of the Defendants' product labeled "Made from Real Ginger" that is described as made using ginger oleoresin.

---

[27] The survey question wording is:

    Based on your understanding of the product package we showed you, what is your understanding of the statement "***Made from Real Ginger***" on the Canada Dry Ginger Ale? Please select the option that is closest to your understanding. The ginger ale is made using…

[28] Sampling margin of error is +/- 5.6 percentage points (95% confidence).

**Survey Result:  Consumers' Stated Preference for Defendants' Product Labeled "Made with Real Ginger" Described as Made Using Ginger Root Versus Ginger Oleoresin[29]**

| Responses | No. Respondents | Percent |
|---|---|---|
| Ginger root | 195 | 92.4%[31] |
| Ginger oleoresin | 9 | 4.3% |
| Don't Know | 7 | 3.3% |
| Total | 209 | 100.0% |

63. A substantial majority of the consumers also stated that they are more likely to purchase Canada Dry Ginger Ale because "Made from Real Ginger" means the beverage is made using ginger root instead of ginger oleoresin.  89.2% of the surveyed consumers stated they are much more likely or somewhat more likely to purchase the Defendants' product because "Made from Real Ginger" means the beverage is made using ginger root.

---

[29] The survey question is a referendum on two Canada Dry Ginger Ale products that are the same in every way, except one is made using ginger root and the other is made using ginger oleoresin. The question wording is:

　　　　If these were your only two options, which of these two ginger ales would you purchase?

[31] The sampling margin of error is +/- 3.6 percentage points (95% confidence).

**Survey Result:  Consumers' Likelihood to Purchase Canada Dry Ginger Ale Because "Made from Real Ginger" Means the Beverage Is Made Using Ginger Root Instead of Ginger Oleoresin[32]**

| Responses | No. Respondents | Percent |
|---|---|---|
| Much more likely to purchase | 146 | 71.6%[33] |
| Somewhat more likely to purchase | 36 | 17.6%[34] |
| Neither more or less likely to purchase | 7 | 3.4% |
| Somewhat less likely to purchase | 0 | 0.0% |
| Much less likely to purchase | 4 | 2.0% |
| Don't Know | 2 | 1.0% |
| Not Asked | 9 | 4.4% |
| Total | 204 | 100.0% |

64. The results of the price premium survey are consistent with the results of the consumer perceptions survey.  Based on my analysis of the data from the conjoint survey and my expert judgment, I conclude that class members paid a price premium that is solely attributable to the "Made from the Real Ginger" claim used by the Defendants.  The price premium solely attributable to the "Made from the Real Ginger" claim is as follows:

---

[32] This survey question was asked of respondents that selected the ginger root ginger ale in the referendum question.  The survey question wording is:

> How likely or not likely are you to purchase Canada Dry Ginger Ale because "Made from Real Ginger" means that the beverage is made using <u>ginger root</u> instead of <u>ginger oleoresin</u>?  Because "Made from Real Ginger" is made using ginger root instead of ginger oleoresin, I would be…

[33] Sampling margin of error is +/- 6.2 percentage points (95% confidence).

[34] The sampling margin of error is +/- 5.2 percentage points (95% confidence).

**Survey Results from the Price Premium Survey of California Ginger Ale Consumers:
Price Premium Attributable to the "Made from Real Ginger" Label**

| Product Category | No. Respondents | Price Premium / Product Price | Percent |
|---|---|---|---|
| 2-Liter | 401 | $0.14 / $3.00 | 4.67% |
| 12-Pack (12 cans of 12 oz. each) | 403 | $0.28 / $7.00 | 4.00% |

65. That is, for the 2-Liter Canada Dry Ginger Ale, the price premium attributable to the challenged claim is at least **4.67%.** For the 12-pack Canada Dry Ginger Ale, the price premium is at least **4.00%.** To be conservative, I would apply the 4.00% price premium to Canada Dry Ginger Ale products other than the 2-Liter products, while the 4.67% price premium is applied to the 2-Liter products.

66. In summary, my surveys consist of mutually reinforcing findings. First, the substantial majority of the consumers of Canada Dry Ginger Ale understand the "Made from Real Ginger" claim to mean the beverage is made using ginger root from the ginger plant, not extracts. Second, this perception is material to these consumers – i.e., it influences their decision to purchase the Defendants' products. Over nine out of 10 consumers prefer to purchase a Canada Dry Ginger Ale that is made using ginger root over one that is made using ginger oleoresin extracted from the ginger root. Almost nine of 10 consumers stated they are more likely to purchase the Defendants' product because "Made from Real Ginger" means the beverage is made using ginger root. Using a rigorous price premium methodology for quantifying the market value of the "Made from Real Ginger" claim, I conclude that at a minimum the class members paid a 4 percent price premium solely attributable to the "Made from Real Ginger" claim.

**<u>CONCLUSION</u>**

67. I drew on my 18 years in designing and conducting online surveys and my 25 years of experience in survey research to design and produce a reliable consumer survey.  I followed a rigorous protocol for developing the survey questionnaires using cognitive interviews and pretesting.  I carried out a series of quality control and quality assurance measures to confirm that the respondents understood the survey questions.  I designed the survey sample to identify a representative sample of California adult consumers of ginger ale.  I processed, analyzed, and reported on the survey data based on my experience and expert judgment.

68. In my expert opinion, my consumer survey provides a reliable and accurate measurement of the extent to which (i) California Canada Dry Ginger Ale consumers understand the "Made from Real Ginger" claim to mean that beverage is made using ginger root from the ginger plant, (ii) the "Made from Real Ginger" claim is material to the purchasing decisions of California Canada Dry Ginger Ale consumers by communicating that the beverage is made using ginger root from the ginger plant, and (iii)  there is a marketplace price premium attributable to the challenged "Made from Real Ginger" claim for California consumers of Canada Dry Ginger Ale.

69. The facts and data that I considered for developing the surveys and my opinions in this report are cited herein and listed in my attached reliance list.  I reserve the right to modify my opinions if I am provided additional information, and to supplement them if necessary to respond to criticisms or objections from the opposing party.

_____

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.  Executed in Redwood City, California on April 9, 2018.

_____
J. MICHAEL DENNIS, PH. D

APRIL 9, 2018

_____
DATE

## List of Attachments

A       Curriculum Vitae of J. Michael Dennis, Ph.D.

B       Survey Questionnaire for the Consumer Perceptions Survey (Pretest and Main Study)

C       Survey Questionnaire for the Consumer Perceptions Survey (Cognitive Interviews)

D       Online Screen Captures for the Consumer Perceptions Survey

E       Survey Questionnaire for the Price Premium Survey

F       Online Screen Captures for the Price Premium Survey

G       Marginal Frequency Distributions for the Consumer Perceptions Survey

H       Marginal Frequency Distributions for the Price Premium Survey

I       Codebook for the Raw Survey Data for the Consumer Perceptions Survey

J       Codebook for the Raw Survey Data for the Price Premium Survey

K       List of Considered Materials