1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

8

NORTHERN DISTRICT OF CALIFORNIA

9
10

JACKIE FITZHENRY-RUSSELL, et al.,

11

Plaintiffs,

12

v.

13

DR. PEPPER SNAPPLE GROUP, INC.,
et al.,

14

Defendants.

15
16

Case No. 17-cv-00564 NC

**ORDER GRANTING CLASS
CERTIFICATION; ORDER
DENYING MOTION TO EXCLUDE;
ORDER GRANTING IN PART AND
DENYING IN PART DR. PEPPER'S
MOTION TO SEAL**

Re: Dkt. Nos. 180, 183, 185

17          In this putative consumer class action, plaintiffs Jackie Fitzhenry-Russell and

18     Geghman Margaryan allege defendants Dr. Pepper Snapple Group, Inc. and Dr.

19     Pepper/Seven Up, Inc.[1] defrauded California consumers by selling Canada Dry Ginger Ale

20     with the phrase "Made From Real Ginger" emblazoned on its packaging when, in fact,

21     Canada Dry does not contain the type of, or amount of, ginger consumers would expect.

22     Instead, Canada Dry contains a ginger derivative, ginger oleoresin.  Plaintiffs allege that as

23     a result of this misleading packaging, Dr. Pepper was wrongfully able to charge a 4% price

24     premium on Canada Dry.

25          Plaintiffs move to certify a class of Canada Dry consumers in California, and Dr.

26

27     _____

28     [1] Though the Court recognizes that there are two related defendants in this action, the
       Court will refer to defendants collectively as "Dr. Pepper" in the singular, unless required
       to differentiate.
       Case No. 17-cv-00564 NC

Pepper opposes the motion. At the same time, Dr. Pepper moves to exclude plaintiffs' expert declarations in support of class certification.

Because the Court finds that Federal Rules of Civil Procedure 23(a) and (b)(3) are satisfied, the Court GRANTS plaintiffs' motion for class certification. The Court DENIES the motion to exclude. Moreover, the Court GRANTS IN PART and DENIES IN PART Dr. Pepper's motion to seal portions of its opposition brief, and certain exhibits.

## I.    BACKGROUND

### A.    The Parties

There are two named plaintiffs in this action: Fitzhenry-Russell and Margaryan. Fitzhenry-Russell was a Canada Dry purchaser for many years before she allegedly realized that it contained no ginger. She claims she was exposed to both the "Made From Real Ginger" claim on Canada Dry packaging, and defendant's television commercials advertising Canada Dry. Dkt. No. 97 at 17. In the complaint, it states that over the past two years, she purchased approximately one case of Canada Dry per year, but before that, she purchased one case per month. *Id.* at 16. Fitzhenry-Russell claims that had she known Canada Dry's "true nature," she would either not have purchased the drink, or would have paid less for it. *Id.* at 18.

Margaryan, on the other hand, purchased Canada Dry one time believing that it contained ginger root. *Id.* at 19. The complaint alleges that but for the phrase "Made From Real Ginger" on the label, which Margaryan relied on, he would not have purchased Canada Dry. *Id.* at 19-20.

Defendant Dr. Pepper Snapple Group, Inc. is a wholly-owned subsidiary of defendant Dr. Pepper/Seven Up, Inc. *Id.* at 5. Dr. Pepper Snapple Group "manufactures, distributes, markets, advertises, and sells" Canada Dry. *Id.*

### B.    The Lawsuit

The operative complaint alleges claims under (1) the Consumers Legal Remedies Act, Cal. Civ. Code § 1750; (2) the false advertising law, Cal. Bus. & Prof. Code § 17500; (3) common law fraud; and (4) unlawful, unfair, and fraudulent trade practices, Cal. Bus.

& Prof. Code § 17200. Dkt. No. 97. Plaintiffs previously survived a motion to dismiss the consolidated complaint under Rule 12(b)(6), and for lack of personal jurisdiction. Dkt. No. 87. Plaintiffs move for class certification of "[a]ll persons who, between December 28, 2012 and the present, purchased any Canada Dry Ginger Ale products in the state of California." Dkt. No. 180 at 7. Dr. Pepper opposes class certification, dkt. no. 183-4, and moves to strike plaintiffs' expert declarations. Dkt. No. 185. All parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). Dkt. Nos. 15, 19.

## II.   DISCUSSION

Before discussing the merits of the class certification motion, the Court addresses Dr. Pepper's motion to exclude the expert declarations and testimony of plaintiffs' experts. This ordering is necessary because if these expert reports are found to be inadmissible, a class may not be certified.[2] After addressing the motion to exclude, the Court will turn to the class certification motion. The Court will order its analysis of that motion as follows: first, the class definition; second, Rule 23(a); and third, Rule 23(b)(3). Lastly, the Court will turn to Dr. Pepper's motion to seal portions of its opposition brief, and certain exhibits. Dkt. No. 183.

### A.   Dr. Pepper's Motion to Exclude is DENIED.

Dr. Pepper moves to strike the expert declarations and testimony of Dr. Michael Dennis and Colin Weir. Dkt. No. 185. Plaintiffs oppose the motion. Dkt. No. 193.

#### 1.   Legal Standard

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[2] There was dispute at the hearing on these motions regarding whether the class could be certified if the Court excluded plaintiffs' expert declarations. Dkt. No. 198 at 13-16 (Hearing Transcript). The answer to that question is "no." The exclusion of the consumer perceptions survey would not be fatal because plaintiffs have Dr. Pepper's internal documents that tend to prove materiality. But plaintiffs' only evidence as to a way to calculate damages *is* the price premium survey. Without some way to calculate damages class-wide, no class could be certified.

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"The duty falls squarely upon the district court to 'act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards.' " *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993). In *Daubert*, the United States Supreme Court identified "four factors that may bear on the analysis: (1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray v. S. Route Maritime SA*, 870 F.3d 915, 922 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 593-94).

Importantly, the Court's duty is to evaluate the soundness of the expert's methodology, not the correctness of the expert's conclusions. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* The Court has broad discretion and flexibility in assessing an expert's reliability. *Estate of Barbarin*, 740 F.3d at 463.

### a. Dr. Dennis's Declaration

Plaintiffs retained Dr. J. Michael Dennis, Ph.D, the Senior Vice President at the National Opinion Research Center in Chicago, Illinois. Dkt. No. 153-6 at 1 (Dennis Decl.). Dr. Dennis has over 20 years of experience as a survey research expert, as well as

in designing and conducting surveys about the "opinions, perceptions, attitudes, preferences, and values of customers" among other groups. *Id* at 2. Per Dr. Dennis, he has testified on more than 20 occasions as an expert witness in depositions and trials. *Id.* at 3. Dr. Dennis described the scope of his engagement in this case as follows:

> First, I was asked to measure how California Canada Dry Ginger Ale consumers understood the phrase "Made from Real Ginger". Second, I was asked to measure whether the "Made from Real Ginger" claim is material to the purchasing decisions of California Canada Dry Ginger Ale consumers. Third, I was asked to measure whether the "Made from Real Ginger" claim causes any price premium to be paid by California Canada Dry Ginger Ale consumers and if so, the amount of the premium.

*Id.* at 6. To these ends, Dr. Dennis conducted a consumer perceptions survey and a price premium survey. *Id.* As to the consumer perceptions survey, it consisted of two batteries, or sequences, of survey questions: the consumer understanding battery and the referendum battery. *Id.* at 8. The objective of the consumer understanding battery was to measure how California Canada Dry consumers interpreted "Made From Real Ginger." *Id.* The objective of the referendum battery was to measure if the ginger claim was material to Canada Dry consumers' purchasing decisions. *Id.*

The consumer understanding battery was based on "the direct survey questionnaire technique." *Id.* To conduct this battery, respondents were presented with the Canada Dry 12-pack packaging, which they were instructed to view. *Id.* Then, respondents were asked for their understanding of the statement "Made From Real Ginger." *Id.* Respondents were presented with four options to choose from to answer the question "what is your understanding of the statement 'Made From Real Ginger' on the Canada Dry Ginger Ale?" *Id.* at 9. Specifically, respondents were instructed to express their understanding of what Canada Dry was made of using the following categories:

> [1.] Ginger oil, which is extracted from the ginger root using steam
> [2.] Ginger root, which is part of the ginger plant, not an extract
> [3.] Ginger oleoresin, which is extracted from the ginger root using a solvent
> [4.] None of these

*Id.* at 9. The survey found that 78.5% of California Canada Dry consumers understood the statement "Made From Real Ginger" to mean that the beverage was made using ginger root, while 4.8% of consumers understood the claim to mean that Canada Dry was made using ginger oleoresin. *Id.* at 32-33. 8.6% understood the claim to mean Canada Dry was made using ginger oil. *Id.* at 33.

The second part of the consumer perceptions survey was the referendum battery, which was based on a "stated preference survey methodology." *Id.* at 9. Respondents were required to be adult U.S. residents who purchased Canada Dry for personal use within the past three months. *Id.* at 10. The battery consisted of two questions. The first was designed to isolate one factor of Canada Dry, and ask respondents whether, keeping all other attributes of Canada Dry the same, they preferred Canada Dry with its ginger ingredient made from ginger root or ginger oleoresin. *Id.* at 20. Before answering this question, respondents were presented with the definitions of "ginger root" and "ginger oleoresin." Ginger oleoresin was defined almost as in the consumer understanding survey, but with the additional information that a solvent, such as ethanol, could be used to extract the ginger. *See id.* at 19. The second question in the referendum battery measured how likely the respondent would be to purchase Canada Dry if the ginger ingredient was ginger root rather than ginger oleoresin. *Id.* at 21. 92.4% preferred to purchase a version made with ginger root. *Id.* at 34.

To conduct the price premium survey, Dr. Dennis used choice-based conjoint methodology utilizing the Sawtooth software system for online data collection. *Id.* Per Dr. Dennis, "conjoint surveys have been a generally accepted and commonly used tool in market research to estimate market demand for new products and services," and choice-based conjoint is a "technique for quantifying consumer preferences for products and for the component features that make up a product." *Id.* at 21-22. The conjoint survey was used to measure the price premium attributable to the "Made From Real Ginger" claim. *Id.* at 22. The conjoint survey asked respondents to express preferences by choosing from a set of product profiles (i.e., choosing a product from a group of products). *Id.* at 22-23.

Importantly, Dr. Dennis declared he considered "supply-side factors and real-world market transaction information from consumer transaction data for the Defendants' products and for its competitors," which he obtained from a market scan of retail prices of ginger ale beverages sold in the San Francisco Bay Area, and nationally. *Id.* at 7.

Dr. Dennis restricted the price premium survey to people who recently purchased ginger ale, and presented respondents with three product profiles per choice task. *Id.* at 23. There were 10 choice tasks. *Id.* Dr. Dennis stated that conjoint surveys typically have six or more attributes for respondents to consider, and here he limited himself to six attributes. *Id.* Dr. Dennis provided respondents with a "none of these" option in the survey, such that respondents could choose not to select one of the product profiles. *Id.* To analyze the data received from respondents to determine if there is a price premium, "a conjoint study leads to a set of utilities or part-worths that quantify value respondents place on each level of each attribute (e.g., for each price level for the price attribute). To draw inferences from the utility data, conjoint surveys leverage Bayesian statistics (technically, Hierarchical Bayesian modeling) to provide individual respondent-level models." *Id.* at 29-30.

The price premium survey results were calculated using a market simulator using Hierarchical Bayesian models. *Id.* at 30. According to Dr. Dennis, the conjoint survey and market simulator allowed him to calculate the price premium for the marginal consumer attributable to the statement "Made From Real Ginger." *Id.* at 30. This marginal consumer was significant because the price premium resulting from the "Made From Real Ginger" claim was "the same as the willingness to pay of the marginal consumer that can be identified by offering respondents a 'no buy' option in the conjoint survey." *Id.*

The results of the conjoint survey found a 4% price premium attributable to the "Made From Real Ginger" claim. *Id.* at 36.

### b. Mr. Weir's Declaration

Colin B. Weir is the Vice President at Economic and Technology, Inc., in Boston, Massachusetts. Dkt. No. 153-8 at 2. Weir provided the Court with his qualifications, which include co-authorship of numerous articles and a list of cases in which he submitted

declarations. *Id.* at 26-34. Weir was retained "to ascertain whether it would be possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of, and a preliminary estimate of, damages suffered by the proposed class of consumers" as a result of the "Made From Real Ginger" claim. *Id.* at 3. Weir was provided with the retail sales data, including dollar and unit sales for Canada Dry in California between 2012 and 2018. *Id.* at 17. With that data, Weir multiplied the total sales of Canada Dry by 4% to calculate damages. In total, Weir calculated California class-wide damages of $10,778,477.16. *Id.* at 22.

### 2. Discussion

Dr. Pepper's motion to exclude is largely aimed at Dr. Dennis's findings. Dkt. No. 185. Before getting into a substantive discussion of the motion, the Court notes that Dr. Pepper does not argue that Dr. Dennis or Weir are not qualified to testify as experts. Nor does Dr. Pepper argue that plaintiffs' experts used unreliable methods to reach their conclusions as to the consumer perceptions survey. Instead, this motion centers around Dr. Pepper's argument that Dr. Dennis did not properly apply the methodologies behind his consumer understanding survey and referendum battery. Dr. Pepper argues that Dr. Dennis's consumer understanding survey is unreliable under *Daubert* because it "utilized biased, leading questions," while his price premium survey "is plagued with fatal defects." *Id.* at 8. These "fatal defects" are: (1) that his price premium survey does not show consumers paid a price premium on a class-wide basis as a result of the ginger claim, and (2) that his survey does not follow the "basic tenets" of conjoint methodology. *Id.* at 8-9. Moreover, because Weir's declaration relies on Dr. Dennis's conclusions, it too is unreliable, and must be excluded. *Id.* at 9.

### a. The Consumer Perceptions Survey

Dr. Pepper's arguments as to the bias in Dr. Dennis's consumer perceptions survey—which encompasses the consumer understanding survey and referendum battery—are dispatched with ease. The Ninth Circuit has "held that survey evidence should be admitted as long as it is conducted according to accepted principles and is

relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (internal citations, brackets, and quotation marks omitted)); *Pettit v. Procter & Gamble Co.*, No. 15-cv-02150 RS, 2017 WL 3310692, at *4 (N.D. Cal. Aug. 3, 2017) (refusing to exclude survey results). The Ninth Circuit further "made clear that technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Fortune Dynamic*, 618 F.3d at 1036.

Dr. Pepper points to *Strumlauf v. Starbucks Corp.*, in support of its motion to exclude the consumer perceptions survey. No. 16-cv-01306 YGR, 2018 WL 306715, at *6–7 (N.D. Cal. Jan. 5, 2018). But that case differs from this case in a significant manner, and actually undercuts Dr. Pepper's position because Judge Yvonne Gonzalez Rogers did not exclude the expert testimony. Instead, she accorded it "little weight," which is what a jury would be entitled to do if they agreed with Dr. Pepper's argument that Dr. Dennis's survey methodology was unduly biased. *Id.* at *7. In other words, Judge Gonzalez Rogers did not make an exclusion determination under *Daubert*. Dr. Pepper's citation to *Senne v. Kansas City Royals Baseball Corp.*, is similarly unavailing because Magistrate Judge Joseph C. Spero's decision to exclude Dr. Dennis's survey dealt with self-interest bias, a concern that is not raised here. 315 F.R.D. 523, 589–90 (N.D. Cal. 2016), *on reconsideration in part,* No. 14-cv-00608 JCS, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017).

Lastly, Dr. Pepper points to rebuttal expert Dr. Rene Befurt's "vastly different results" in his replication survey of consumers. Dkt. No. 185 at 24. Dr. Befurt is Dr. Pepper's expert tasked with critiquing Dr. Dennis's methodology and findings. In these replication surveys, Dr. Befurt recreated Dr. Dennis's consumer understanding survey, but changed the descriptors of ginger oil, ginger oleoresin, and ginger root. Dkt. No. 184-2 at 22 (Befurt Decl.). But Dr. Befurt's replication surveys do not help Dr. Pepper. Even where "simple language" was used to describe ginger oil, ginger oleoresin, and ginger root, 40.59% of respondents still believed "Made From Real Ginger" meant that Canada Dry was made using "ginger root" as its ginger ingredient. Dkt. No. 185 at 24; Dkt. No. 184-2

at 23. This is still a legally significant percentage of people who would be misled.

Dr. Pepper also points to Dr. Befurt's replication survey using "technical"[3] descriptors of ginger oil, ginger oleoresin, and ginger root. Dkt. No. 184-2 at 22. The replication survey using technical language actually proves the point that Dr. Dennis's survey needs to go to a fact-finder, who may determine if plaintiffs' survey is unduly biased. This is because the replication survey using technical language seems to be designed to confuse respondents, and encourage them to answer that they "don't know" or are "unsure" of what the ginger ingredient behind the "Made From Real Ginger" claim is. After all, which layperson has ever heard of the ginger root powder they purchase in stores being referred to as "triturated ginger?"

Dr. Pepper made one final argument against the consumer perceptions survey at the June 13, 2018, hearing on the motion. Dr. Pepper argued that under Federal Rule of Evidence 702(d), the consumer perceptions survey, even if conducted correctly, did not line up with the facts of this case. As to the consumer understanding survey, Dr. Pepper argued that it does not satisfy Rule 702(d) because neither Fitzhenry-Russell nor Margaryan fell into the category of people that believed that "Made From Real Ginger" meant that Canada Dry was made from ginger root. Instead, Dr. Pepper argues Fitzhenry-Russell and Margaryan fall into the category of people who said they did not know what "Made From Real Ginger" meant. Dr. Pepper uses as evidence the fact that Fitzhenry-Russell testified that she did not know what it meant for Canada Dry to be "truthfully" "Made From Real Ginger," but that it needed to have "enough" ginger to put it on the label. *See* Dkt. No. 184-15 at 10 (Fitzhenry-Russell Dep.). But there is no question that Fitzhenry-Russell believes Canada Dry should have ginger root in it. *Id.* at 42 ("THE WITNESS: Okay. Absolutely not. Ginger flavor is not ginger, root. BY MR.

---

[3] In the survey using technical language, Dr. Befurt described ginger oil, ginger oleoresin, and ginger root as follows: "ginger oil, which is an essential oil extracted from the ginger root using steam distillation," "ginger oleoresin, which is an essential oil and resin mixture obtained from the ginger root using percolation," and "triturated ginger, which is a coarse powder obtained from the ginger root using a bleaching process." Dkt. No. 184-2 at 22.

1   BECKWITH: Q. Did any person tell you that made from real ginger in Canada Dry Ginger

2   Ale had to be real ginger root?  A. No.").[4]

3        As for Margaryan, Dr. Pepper argues that because he testified that he wanted ginger

4   root to be "squeezed like juice" into Canada Dry, he did not believe it was made from

5   ginger root.  This argument is specious.  Margaryan's testimony clearly shows that he

6   believed the term meant that Canada Dry was made using ginger root.  Dkt. No. 184-16 at

7   59 (Margaryan Dep.) (Q. Did you -- when you purchased the Canada Dry ginger ale, did

8   you expect it to have grated ginger in it?  A. When I'm reading on it 'natural,' I am

9   realizing that it's supposed to be made out of the natural thing, the -- the juice. . . .  Q. My

10  question was actually different.  Did you expect, in the Canada Dry ginger ale, for it to

11  have grated ginger in it? A. I'm not sure about grated, but it should have ginger in it.").

12  Thus, the Court DENIES Dr. Pepper's motion to exclude the consumer perceptions survey.

13                    **b.    The Price Premium Survey**

14       Dr. Pepper's more substantive criticisms of Dr. Dennis's findings regard the price

15  premium survey and simulator.  First, Dr. Pepper criticizes that despite Dr. Dennis's

16  representation in his declaration that his survey only contained six features or attributes—

17  brand, type, flavor, nutrition facts, description on front of the package, and price—he

18  instead used 11 factors.  Dkt. No. 185 at 17.  This is because Dr. Dennis counts the

19  description on the front of the Canada Dry packaging as one attribute, where, according to

20  Dr. Pepper, it actually constitutes six attributes: (1) "100% Natural Flavors," (2) "The

21  Original Ginger Soda," (3) "Barrel-Aged," (4) "Made with/from Real Ginger," (5)

22  "Caffeine Free," and (6) "Since 1904/1873."  *Id.* at 17-18.  The number of attributes used

23  is important because the more attributes in a conjoint survey, "the higher risk that it simply

24  becomes too complex for respondents."  *Id.* at 29.  Moreover, Dr. Pepper argues that the

25  _____

26  [4] Plaintiffs' counsel made a very important point at the hearing on the motion to exclude
    and class certification.  Neither Fitzhenry-Russell nor Margaryan knew at the time of their
27  depositions that Canada Dry was made using ginger oleoresin.  Therefore, to the extent
    that Dr. Pepper criticizes the fact that neither Fitzhenry-Russell nor Margaryan mentioned
28  that they believed that citing ginger oleoresin as the ginger ingredient in Canada Dry
    would be misleading, such a criticism is unfair.

six different descriptors on the label should each have been given their own specific attributes as it would otherwise undermine measuring the utility gains from one attribute to another. *Id.* For example, it may be that the reason a person selected Canada Dry when considering the descriptors on the product packaging because he or she thought the "100% Natural Flavors" claim was important, rather than the "Made From Real Ginger" claim. *See id.*

This is problematic, and Dr. Dennis does not assuage the Court's concerns in the reply declaration. He argues that grouping the different product descriptions under one attribute "likely led to a dilution of the respondents' attention (in contrast to showing only one product description for each product option), and therefore reducing possible risk from focalism bias." Dkt. No. 192-2 at 30 (Dennis Reply Decl.). Dr. Dennis points out that had he not included the four product descriptions on the Canada Dry can on the price premium survey, the survey would have been criticized on that basis. *Id.* at 32. The Court understands Dr. Dennis's reasoning, but is not convinced. Plaintiffs' opposition merely parrots Dr. Dennis's reply declaration. Yet just because the conjoint survey may result in overestimating the value consumers placed on the "Made From Real Ginger" claim because some respondents may have selected Canada Dry on the survey due to the "100% Natural" claim does not necessarily render the survey excludable. Dr. Pepper will be free to attack Dr. Dennis's conjoint study as inflating the price premium at trial. *Estate of Barbarin*, 740 F.3d at 463 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Second, Dr. Pepper criticizes that Dr. Dennis did not include an attribute for taste in the survey. Dkt. No. 185 at 18. While perhaps interesting, the problem with this argument is that Dr. Pepper did not follow it up with a "so what" explanation of what legal difference this makes.

Third, Dr. Pepper argues Dr. Dennis did not compare his 4% price premium with available statewide pricing data produced in this case. Dkt. No. 185 at 18. Dr. Pepper points out that one of its other ginger ale products, Schweppes, does not have the ginger

claim, and it sells in stores at either the same price or for less. *Id.* at 27. Plaintiffs vigorously dispute that there was any valid reason to do this, because comparing products side-to-side "cannot reliably measure the presence or absence of any price premium[.]" Dkt. No. 193 at 16. Plaintiffs provide legal authorities in support of their position that using a side-by-side comparison is "bunk." Dkt. No. 193 at 16-17 (collecting cases). Dr. Pepper did not rebut this point, instead opting to double-down on the points made in its motion. But as a matter of common sense, it would not be conceptually sound to simply compare prices as Dr. Pepper suggests, because this would not account for any of the range of other possible reasons for these products to be priced so similarly. *See* Dkt. No. 193 at 16. Moreover, the fact that plaintiff might have used side-by-side comparisons, even if proper, does not render Dr. Dennis's study excludable on that ground.

Fourth, Dr. Pepper argues that Dr. Dennis only considered a consumer's *willingness to pay* in the conjoint survey, not a price premium. Dkt. No. 185 at 18. This is significant because plaintiffs ask for restitution, which is the difference between what they paid for the product, and true market price of the product, which takes into account the value of the challenged claim. *Id.* at 28. This is the most substantive point of contention between the parties as to the price premium survey.

Dr. Pepper discusses two cases that purportedly support exclusion of these studies: *Saavedra v. Eli Lilly & Co.*, No. 12-cv-9366 SVW, 2014 WL 7338930, at *4-5 (C.D. Cal. Dec. 18, 2014) and *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119-20 (C.D. Cal. 2015). The courts in both of these cases found the conjoint surveys lacking because they did not consider supply-side factors, which rendered the price premium surveys unable to calculate damages class-wide under the predominance inquiry of Rule 23(b)(3). *Saavedra*, 2014 WL 7338930, at *5 (finding that where plaintiffs' expert only looked to the demand side of the market equation and ignored supply, the expert's method of computing damages turned into nothing more than the measurement of what an average consumer wants, while ignoring the seller's willingness to sell); *In re NJOY*, 120 F. Supp. 3d at 1119 (The expert's "conjoint methodology could quantify the relative value

1    a class of consumers ascribed to the safety message, but it does not permit the court to turn

2    the relative valuation into an absolute valuation to be awarded as damages." (citation and

3    quotation marks omitted)).

4           The standard for excluding an expert report under Federal Rule of Evidence 702 for

5    lack of reliability is different from the predominance standard of Rule 23(b)(3), as most

6    recently discussed in *Comcast Corp. v. Behrend*, which considers whether the expert's

7    report and findings are sufficiently tethered to the facts of the case and the theory of

8    liability. 569 U.S. 27 (2013). Rather than split up the analysis of the price premium

9    survey between this discussion of the motion to exclude and predominance under Rule

10   23(b)(3) at section III.B.4.a., the Court will discuss all of Dr. Pepper's arguments against

11   the study presented in the motion to exclude here. This is appropriate as these arguments

12   go to both the reliability of the study and its ability to measure damages on a class-wide

13   basis.

14          Plaintiffs defend the conjoint survey by pointing out that the study's measure of

15   willingness to pay is in fact "the willingness to pay of the *marginal consumer* using the

16   fixed historical supply and past market prices (which reflect supply factors)" that can be

17   used to determine a price premium. Dkt. No. 193 at 18. Plaintiffs cite *In re Dial Complete*

18   *Mktg. & Sales Practices Litig.*, in support of the conjoint survey's methodology, a case

19   having a conjoint survey markedly similar to the one here. 320 F.R.D. 326 (D.N.H. 2017).

20   In *In re Dial*, the plaintiffs' expert considered supply-side factors. *Id.* (The expert "first

21   conducted preliminary background research, reviewed market research data, and

22   conducted field research in online and retail stores, to gain an understanding of the

23   consumer liquid hand soap market."). As here, *In re Dial* discusses the concept of using

24   the "marginal consumer" as a proxy for the price premium:

25               if the researcher wants to assess the price premium associated
                 with the infringing feature, then he will need to develop a
26               conjoint survey that assesses the [willingness to pay] of the
                 marginal consumer—i.e. the consumer who is indifferent
27               between buying and not buying the infringing product. It is the
                 [willingness to pay] of the marginal consumer that is equivalent
28               to the price premium associated with the infringing level of the

attribute; this marginal consumer can be identified by offering respondents a "no buy" option.

*Id.* at 336 (quoting Lisa Cameron, Michael Cragg, & Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," LAW360 (Oct. 16, 2013), http://www.law360.com/articles/475390/the-role-of-conjoint-surveys-in-reasonable-royalty-cases) (last visited June 17, 2018)) (emphasis in original).

As in *In re Dial*, Dr. Dennis provided a "no-buy" option in his conjoint survey to determine willingness to pay when he gave respondents the option to select "none of these." In *In re Dial*, the expert held the quantity of product sold constant on the demand and supply graph in determining the product's market price without the offending claim. *Id.* at 336. The expert could do so because a known quantity of the product had been sold in real life. The same is known here. Using this model, the expert in *In re Dial* sought to calculate the highest price at which Dial could have sold the same number of products without the challenged claim in real life. *Id.* The difference between the price of what Dial actually charged for the product, and the expert's model, "would seem to capture the full measure of damages suffered by consumers who actually bought the allegedly misrepresented product." *Id.*

> The number of products Dial sold with the offending claims is known . . . . Those products were sold at a price determined by the intersection of demand and supply in the actual market. [The expert's] model asks, it appears, "At what price in that actual market in which Dial sold the offending products could Dial have sold the equivalent number of products without the false claim(s)?" By determining the marginal consumer's willingness to pay for the comparative product (not an "average" or "median" willingness to pay), [the expert's] model discloses that maximum price—and that price is not only tethered to the real and stable market, but, as noted, also accounts for losses attributable to all products sold that included a price premium associated with the misrepresented feature.

*Id.* at 336–37. Moreover, that court actually distinguished the conjoint survey in *In re Dial* from those in *Saavedra* and *NJOY* because the expert in that case did consider supply-side factors. *Id.* at 334. Thus, the conjoint survey here may be distinguished on the same basis because Dr. Dennis's conjoint survey does consider supply-side factors.

Here, the conjoint survey "used actual market-clearing prices as the basis for the

prices in the survey, actual competitor products, and actual label claims on those products." Dkt. No. 193 at 18 (citing Weir and Dennis Declarations and Reply Declarations); Dkt. No. 180-1 at 24 (Dennis Decl.). Per plaintiffs, the conjoint survey "was performed in a market that is long-established and efficient, where retailers' pricing is responsive to market forces," and that it took into account the fixed quantity of supply of Canada Dry because those sales occurred in the past. Dkt. No. 193 at 18. Therefore, it does appear that plaintiffs calculated the price premium consumers paid for the "Made From Real Ginger" claim, and not just a theoretical willingness to pay. The price premium study therefore passes muster under *Daubert* and Federal Rule of Evidence 702.

Dr. Pepper did not in any substantive way respond to plaintiffs' rebuttal arguments in the reply brief. Thus, upon the Court's review of plaintiffs' authorities, the Court does not find the price premium survey excludable; the motion to exclude the price premium survey is DENIED.

### c. Weir Declaration

As to Weir's declaration, Dr. Pepper's criticism is mainly that it is faulty because it depends on Dr. Dennis's allegedly faulty findings. *Id.* at 19. Yet because the Court does not find Dr. Dennis's methodology faulty, the motion to exclude is DENIED.

At bottom, Dr. Pepper's motion to exclude lacks merit because it does not undermine the reliability of Dr. Dennis's findings, nor does it undermine Weir's findings, which are based on Dr. Dennis's findings. Plaintiffs' expert evidence is tethered to the facts of their case and their theory of liability. To the extent that plaintiffs' expert evidence is imperfect, these imperfections go to the weight of the evidence, not the admissibility. It is not for the Court to exclude such evidence on these grounds. Thus, the motion to exclude is DENIED.

### B. Plaintiffs' Motion for Class Certification is GRANTED.

#### 1. Legal Standard

As the parties seeking certification, plaintiffs bear the burden of demonstrating compliance with Federal Rule of Civil Procedure 23. *See Comcast*, 569 U.S. at 33. "Rule

23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, plaintiffs must affirmatively demonstrate compliance with all four requirements of Rule 23(a), and at least one of the sub-sections of Rule 23(b). *Id.; see Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001). The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that the requirements of Rule 23(a) and Rule 23(b)(3) are met. *Wal-Mart*, 564 U.S. at 352.

Rule 23(a) imposes four prerequisites: (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) the claims or defenses of the named plaintiffs must be "typical of the claims or defenses of the class" (typicality); and (4) the named parties must show that they "will fairly and adequately protect the interests of the class" (adequacy). Fed. R. Civ. P. 23(a)(1)-(4).

To certify a Rule 23(b)(3) class, as sought here, plaintiffs must also show that "questions of law or fact common to class members predominate over any questions affecting only individual members" (predominance); and that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy" (superiority). Fed. R. Civ. P. 23(b)(3).

The Court's "class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (internal quotations and citations omitted). "That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast*, 569 U.S. at 33–34 (internal quotations and citations omitted). However, the ultimate goal of Rule 23 is to determine whether efficiency and justice are best served by plaintiffs pursuing their claims on behalf of a class as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart*, 564 U.S. at 348 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701

(1979)).  The decision of whether to certify a class is entrusted to the sound discretion of the district court.  *Zinser*, 253 F.3d at 1186.

### 2.    Class Definition

The motion seeks to certify a class of:

> All persons who, between December 28, 2012 and the present, purchased any Canada Dry Ginger Ale products in the state of California.

Dkt. No. 180 at 7.[5]

### 3.    Rule 23(a) Is Satisfied.

#### a.    Numerosity: The Class Is Sufficiently Numerous.

As to the first Rule 23(a) requirement, plaintiffs must demonstrate that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Here, neither party addresses this prong with any detail because it is clear that the class is sufficiently numerous.  Dr. Pepper sold millions of units of Canada Dry during the class period.  Dkt. No. 180 at 22.  It stands to reason that the class would be sufficiently numerous for class status.  The numerosity requirement is satisfied.

#### b.    Commonality: Common Questions Exist.

Next, there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(b).  Trivial or tangential common questions do not fulfill this prerequisite.  Instead, "commonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.' "  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (alteration in original) (quoting *Wal-Mart*, 564 U.S. at 350).  Unlike Rule 23(b)(3)'s predominance requirement, which balances common questions against individual ones, "commonality only requires a single significant question of law or fact."  *Id.* at 589.

Plaintiffs argue that the common question is: "was Defendant's 'Made From Real

---

[5] This proposed California class that plaintiffs seek to certify is narrower than the nationwide class plaintiffs identified in the operative complaint.  Dkt. No. 97.

Case No. 17-cv-00564 NC              18

Ginger' label likely to deceive reasonable consumers?" Dkt. No. 180 at 23. In other

consumer fraud cases in this district, courts have found similar common questions to be

sufficient to satisfy commonality. *Pettit*, 2017 WL 3310692, at *2-4 ("Was the 'flushable'

label P&G affixed to Freshmates false?"), *Kumar v. Salov North America Corp.*, No. 14-

cv-02411 YGR, 2016 WL 3844334, at *4-5 (N.D. Cal. July 15, 2016) ("whether Salov's

labels were likely to deceive a reasonable consumer"); *In re ConAgra Foods, Inc.*, 90 F.

Supp. 3d 919, 973 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844

F.3d 1121 (9th Cir. 2017), *and aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 F.

App'x 654 (9th Cir. 2017) (finding the question "whether ConAgra's '100% Natural'

marketing and labeling of Wesson Oil products was false, unfair, deceptive, and/or

misleading" was sufficient to satisfy the commonality requirement of Rule 23(a)).

Based on these courts' findings in similar cases, the Court follows this line of cases,

and finds the commonality requirement satisfied.

### c. Typicality: Plaintiffs Are Sufficiently Typical of the Class.

Third, Plaintiffs' claims must be "typical of the claims or defenses of the class."

Fed. R. Civ. P. 23(a)(3). This standard is "permissive," and claims are typical if they are

"reasonably co-extensive with those of absent class members; they need not be

substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

"The test of typicality 'is whether other members have the same or similar injury, whether

the action is based on conduct which is not unique to the named plaintiffs, and whether

other class members have been injured by the same course of conduct.' " *Hanon v.*

*Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108

F.R.D. 279, 282 (C.D. Cal. 1985)).

Class certification should not be granted "if 'there is a danger that absent class

members will suffer if their representative is preoccupied with defenses unique to it.' " *Id.*

(quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*,

903 F.2d 176, 180 (2d Cir. 1990)). "To be typical, a class representative need not prove

that she is immune from any possible defense, or that her claim will fail only if every other

class member's claim also fails. Instead, she must establish that she is not subject to a defense that is not 'typical of the defenses which may be raised against other members of the proposed class.' " *In re ConAgra Foods*, 90 F. Supp. 3d at 974 (quoting *Hanon*, 796 F.2d at 508).

Plaintiffs argue that Fitzhenry-Russell's and Margaryan's claims are typical of the claims of other class members because they "like all class members: purchased Canada Dry during the class period that DPSG had labeled 'Made From Real Ginger'; believed it was made using ginger root not a flavor extract; paid a price premium based on that claim being on the label, and are seeking restitution of the price premium." Dkt. No. 180 at 24 (internal citations omitted). On the other hand, Dr. Pepper gives three reasons why Fitzhenry-Russell and Margaryan are not typical of the class. Dkt. No. 183-4 at 16-18. First, Dr. Pepper argues that plaintiffs are not typical of the putative class because they testified at their depositions that they are not seeking monetary relief. *Id.* at 16.

Second, as to Fitzhenry-Russell, Dr. Pepper argues that she is not typical of the class because she bought Canada Dry not because of the "Made From Real Ginger" claim, but instead because she enjoys its "flavor, crisper taste, and effervescence." *Id.* In addition, Dr. Pepper argues she is not a typical class member because she had been buying Canada Dry long before the "Made From Real Ginger" claim appeared on the label, a change that Fitzhenry-Russell did not notice. *Id.* Lastly, per Dr. Pepper, Fitzhenry-Russell is atypical because she always believed that Canada Dry had real ginger in it. *Id.*

Third, as to Margaryan, Dr. Pepper argues that his understanding of the Canada Dry label, and the phrase "Made From Real Ginger" is atypical, as he mentally translates words on the label from English to his native Armenian. *Id.* at 17. This is problematic, Dr. Pepper claims, "because the Armenian language uses words differently than the English language—and particularly words like 'organic,' 'natural,' and 'real' that form the basis of this suit—Mr. Margaryan's understanding of the label at issue here is atypical of the class he seeks to represent, which is made up primarily of English speakers." *Id.* Dr. Pepper maintains that this atypical understanding has already been made evident by the number of

corrections contained in the errata sheet to his deposition. *Id.* at 18.

As to Dr. Pepper's first argument, that plaintiffs are not typical because they are not seeking monetary damages, the Court rejects this argument. It is correct that both named plaintiffs testified that they were not seeking monetary compensation. *Id.* at 16. But in the complaint, the plaintiffs specifically request monetary damages. Dkt. No. 97 at 32. Dr. Pepper's argument that typicality is defeated by Fitzhenry-Russell and Margaryan's deposition testimony is unsupported by any legal analysis, particularly in light of the complaint's clear prayer for relief.

### i. Fitzhenry-Russell

A couple of Dr. Pepper's arguments regarding Fitzhenry-Russell have teeth. The first does not. Dr. Pepper's argument that Fitzhenry-Russell is not a typical class representative because she liked the flavor, taste, and effervescence of Canada Dry hardly renders her atypical.[6] Dr. Pepper would raise the following defense against any plaintiffs: even if the ginger claim proved false, consumers still would have bought Canada Dry because of the soda's other virtues. *See In re ConAgra Foods*, 90 F. Supp. 3d at 974; *Astiana v. Kashi Co.*, 291 F.R.D. 493, 503 (S.D. Cal. 2013) ("That Plaintiffs may have considered other factors in their purchasing decisions does not make them atypical"). After all, most people do not buy a drink if they find the taste, flavor, or "effervescence" repulsive. Therefore, this defense, rather than rendering Fitzhenry-Russell atypical, renders her an *even more* typical member of the class.

Next, according to Dr. Pepper, Fitzhenry-Russell never noticed the change in the labeling that added the "Made From Real Ginger" claim. If true, this is a problem for the class on the merits because, even if all putative class members do not need to show they

---

[6] Dr. Pepper makes the bold and unsupported statement that Fitzhenry-Russell "expressly stated[] that she did *not* purchase Canada Dry primarily because it bore the label stating "Made From Real Ginger." Dkt. No. 183-4 at 16 (emphasis in original). Plaintiffs appropriately call Dr. Pepper out on this lie. Dkt. No. 192 at 16 n.14. To the extent that Dr. Pepper argues that Fitzhenry-Russell never listed the "Made From Real Ginger' claim as a primary reason why she purchased Canada Dry, Dr. Pepper has no one to blame but itself because as far as the Court can tell, at the deposition it concentrated on all of the other reasons Fitzhenry-Russell might have bought Canada Dry. *See* Dkt No. 183-4 at 16.

relied on the ginger claim, the named plaintiffs must show they relied on the phrase "Made From Real Ginger." Dkt. No. 183-4 at 16-17 (citing *Swearingen v. Pac. Foods of Oregon, Inc.*, No. 13-cv-04157 JD, 2014 WL 3767052, at *2 (N.D. Cal. July 31, 2014) (discussing the need to plead reliance at a motion to dismiss)). On the other hand, plaintiffs presented the Court with cases demonstrating that in determining named plaintiffs' typicality—even when a defendant is alleging a lack of reliance—" 'the focus should be on the defendants' conduct and the plaintiffs' legal theory, not the injury caused to the plaintiff.' " *Farar v. Bayer AG*, No. 14-cv-04601 WHO, 2017 WL 5952876, at *6 (N.D. Cal. Nov. 15, 2017) (quoting *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 661 (C.D. Cal. 2014)).

Even so, if true that Fitzhenry-Russell did not rely on the alleged misrepresentation, she might not be a typical class member because Dr. Pepper could raise specific defenses against her (i.e., that she was not defrauded). *Hanon*, 976 F.2d at 508-09. But plaintiffs point to one piece of deposition testimony supporting their contention that Fitzhenry-Russell *was* deceived: "A. I really just don't remember the whole commercial, so I can't tell you for sure. Q. Nothing about that commercial caused you to buy Canada Dry, you were already buying it by the time you saw the commercial. Right? . . . . THE WITNESS: I -- I was buying it prior to that. But it did make me think it had real ginger root in it." Dkt. No. 180-71 at 8 (Fitzhenry-Russell Dep.); Dkt. No. 192 at 15 n.12. As the Court noted in its previous order, dkt. no. 88, those commercials were not puffery, and contained a ginger claim. *Id.* at 14 ("each of the commercials contains certain key commonalities, namely the 'Jack's Ginger Farm' sign, the setting of the ginger field, and identical voiceovers at the end of the commercials stating 'Real Ginger, Real Taste.' ").

Plaintiffs' point is that *even if* Fitzhenry-Russell already believed Canada Dry had ginger root in it, Dr. Pepper's campaign to make consumers believe that Canada Dry was "Made From Real Ginger" was a factor in Fitzhenry-Russell's *continued* purchasing of the product, and her continued belief that Canada Dry was made using ginger root. Dkt. No. 192 at 15-16. Dr. Pepper failed to get clear testimony to the effect that Fitzhenry-Russell never noticed the packaging change. Instead, the question Dr. Pepper asked on this point

was whether Fitzhenry-Russell could remember a specific time when she noticed that Canada Dry had added the words "Made From Real Ginger" to its packaging. Fitzhenry-Russell answered in the negative. *Id.* The Court is unconvinced, however, that this renders her atypical, because *even if* Fitzhenry-Russell cannot point to the moment she noticed the ginger claim, it is highly likely that most of the putative class cannot point to a moment in which they noticed the addition of the "Made From Real Ginger" claim to the Canada Dry packaging either. Dkt. No. 184-15 at 81 (Fitzhenry-Russell Dep.).

Elsewhere in the deposition, Fitzhenry-Russell discusses the "Made From Real Ginger" claim in a way that makes clear that she had noticed the ginger claim on the packaging, even if she does not remember specifically noticing it. Dkt. No. 180-71 at 5 (Fitzhenry-Russell Dep.) ("THE WITNESS: When they say made with real ginger, I – I'm a consumer and I assume that that means real ginger"), 6 ("Q. Do you know whether Canada Dry and Seagram's labeled their products as made with real ginger or made from real ginger? . . . THE WITNESS: Yes. . . . Q. Which do they say, made with or made from? A. One says from and one says with. Q. Which says with? A. Seagram's. Q. Which says from? A. Canada Dry. Q. What's the difference in your mind, with and from? A. They are both the same thing."). Even though the record is not crystal clear that Fitzhenry-Russell noticed the "Made From Real Ginger" claim such that she relied on it, the Court finds plaintiffs have sufficiently shown that at some point Fitzhenry-Russell noticed and relied on Canada Dry's ginger claim.

Lastly, Dr. Pepper argues that if Fitzhenry-Russell always believed Canada Dry had ginger root in it, then she was not deceived as a result of the ginger claim. *See* Dkt. No. 183-4 at 16. The parties dispute what Fitzhenry-Russell said as opposed to what she meant in her deposition. Unfortunately, the deposition transcript did not leave a clear record:

> Q. And in that 40 years of buying Canada Dry Ginger Ale, do you know whether at times it said "Made from real ginger" and at times it said something else?
>
> A. In my mind -- and I don't – can't say that this is absolutely sure, but it seems to me that it did say.

Q. For 40 years?

MR. SAFIER: Lacks foundation.

THE WITNESS: Not all for the whole 40 years. It obviously doesn't now. But in my mind I don't know why I have that in my mind, maybe it's a commercial, maybe it's something else, *but in my mind it did have real ginger in it*

Dkt. No. 184-15 at 80-81 (Fitzhenry-Russell Dep.) (emphasis added). Plaintiffs are correct that nowhere in the deposition does Fitzhenry-Russell say that she *always* believed that Canada Dry had ginger root in it. And the Court is inclined to give Fitzhenry-Russell the benefit of the doubt on this point because Dr. Pepper's counsel's question was both compound and convoluted, and Fitzhenry-Russell's testimony did not communicate that she *always* believed Canada Dry had real ginger in it.

Thus, while this question is a close-call, the Court finds that Fitzhenry-Russell is typical of the class, and she has sufficiently shown by a preponderance of the evidence that she was deceived as a result of Dr. Pepper's ginger claim, meaning that she has suffered the same alleged injury as the rest of the class. *Wal-Mart*, 564 U.S. at 352.

### ii. Margaryan

The Court finds no merit in Dr. Pepper's arguments regarding Margaryan's typicality as a class representative due to his English language comprehension. While Margaryan may have expressed some idiosyncratic English translations in his deposition, these translations do not bear on his typicality as a class representative. The Court would not pronounce Margaryan typical of the class if, for example, he had translated the word "real" in "Made From Real Ginger" as "organic"—meaning he believed that he believed the Canada Dry ginger claim meant "Made From *Organic* Ginger." But this is not Dr. Pepper's argument, and plaintiffs point to deposition testimony showing Margaryan understood the representation on the Canada Dry packaging to mean that it was made from ginger root. *Id.* at 17 n.15 (citing Dkt. No. 180-72 at 8 (Margaryan Dep.); *see also* Dkt. No. 184-18 (Margaryan Dep. Errata). He understood the phrase "Made From Real Ginger" to mean that Canada Dry was made using ginger root, not a ginger extract. He alleged that he was therefore misled. *Id.* at 17. The Court therefore finds that Margaryan

too is typical of the class.

### d. Adequacy: Plaintiffs Are Adequate Representatives, and Plaintiffs' Counsel is Adequate.

Finally, plaintiffs must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine this, the Court asks two questions: first, do the proposed class representatives and their counsel "have any conflicts of interest with other class members"; and second, will the proposed class representatives and their counsel "prosecute the action vigorously on behalf of the class"? *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon*, 150 F.3d at 1020).

Plaintiffs assert they are adequate class representatives because they have no conflicts of interests with the class, and "stand in the same shoes" as the other class members. Dkt. No. 180 at 25. Moreover, plaintiffs' counsel, Gutride Safier LLP, also believes it will adequately protect the interests of the class based on its extensive experience litigating similar cases and its performance thus far in this case. *Id.* The Margarian Law Firm serves as co-plaintiffs' counsel in this case, and also maintains that it is adequately representing the putative class. *Id.* Both firms represent that they have no conflicts of interests with the class. *Id.* at 26. Dr. Pepper argues that Fitzhenry-Russell and Margaryan are not adequate class representatives because they do not seek the same damages as the putative class. Dkt. No. 183-4 at 19. As to plaintiffs' counsel, Dr. Pepper reiterates its previous criticisms of Gutride Safier, namely that they have been held jointly and severally liable on an attorneys' fees motion for $500,000 in a separate action, and because the Court previously sanctioned them. *Id.* at 19-20.

Because the Court found Fitzhenry-Russell and Margaryan are typical of the class, and Dr. Pepper's only argument as to adequacy is identical to its typicality argument, the Court finds Fitzhenry-Russell and Margaryan to be adequate class representatives. The Court finds plaintiffs' counsels adequate based on their effective, if imperfect, representation of the class thus far.

### 4. Rule 23(b)(3) Is Satisfied.

The Court turns to Rule 23(b)(3). To survive this final inquiry, plaintiffs must show common questions predominate over individual ones, and that a class action is superior to individual actions in fairly and efficiently adjudicating this case.

### a. Predominance: Individual Issues Do Not Predominate.

The first line of inquiry is whether individual or common issues would predominate class-wide litigation. As the Ninth Circuit summarized:

> The Rule 23(b)(3) predominance inquiry is far more demanding than Rule 23(a)'s commonality requirement. The presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). Rather, a court has a duty to take a close look at whether common questions predominate over individual ones, and ensure that individual questions do not overwhelm questions common to the class. In short, the main concern of the predominance inquiry under Rule 23(b)(3) is the balance between individual and common issues.

*In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679, 691 (9th Cir. 2018) (internal quotation marks, citations, and alterations omitted) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Hanlon*, 150 F.3d at 1022; *Comcast*, 569 U.S. at 34; *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545–46 (9th Cir. 2013)).

Plaintiffs' position is that common questions predominate regarding whether defendant's "Made From Real Ginger" label was false or misleading because that question may be answered by common proof.[7] Dkt. No. 180 at 27. In support their argument, plaintiffs proffer survey evidence. The consumer understanding survey and referendum battery seek to prove the *materiality* of the "Made From Real Ginger" claim, *id.* at 28, 31, while the conjoint survey seeks to prove *damages*, by showing that a price premium existed on Canada Dry due to the allegedly false "Made From Real Ginger" claim.

---

[7] Dr. Pepper claim that Canada Dry labeling was not uniform throughout the class period because the 2-liter bottle of Canada Dry bore the following statement: "Canada Dry Ginger Ale has a crisp, refreshing taste because it's made with 100% Natural Flavors, including Real Ginger." Dkt. No. 183-4 at 22 n.7. Dr. Pepper states that this undermines predominance. The Court is unpersuaded. Plaintiffs point out that this statement was on the back of the 2-liter bottle only, which had emblazoned on the front the words "Made From Real Ginger." Dkt. No. 192 at 8. Indeed, the "Made From Real Ginger" claim was placed in large print on all Canada Dry products throughout the class period.

In determining if common questions predominate, the Court identifies the substantive issues related to plaintiff's claims and then considers the proof necessary to establish each element of the claim, and then considers how these issues would be tried. *See* Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 10 § 10:412 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). Accordingly, the Court addresses predominance as to each of the substantive claims: (1) the CRLA, Cal. Civ. Code § 1750; (2) the FAL, Cal. Bus. & Prof. Code § 17500; (3) common law fraud; and (4) the UCL, Cal. Bus. & Prof. Code § 17200.

### i. Materiality and Reliance

As to materiality, Dr. Pepper argues that even if there is a common question regarding whether "Made From Real Ginger" was likely to mislead consumers, there is not a common *answer* to that question. Dkt. No. 180 at 22. In other words, consumers may interpret the meaning of "Made From Real Ginger" in many ways. *Id.* These different interpretations are purportedly evidenced by Fitzhenry-Russell's differing deposition testimonies regarding what they believed "Made From Real Ginger" means. *Id.* at 23. Per Dr. Pepper, all plaintiffs can show to prove that consumers believed that "Made From Real Ginger" meant that Canada Dry contained ginger root, rather than ginger extract, is their survey evidence. *Id.* at 24.

But Dr. Pepper misapplies the law. "Courts generally consider claims under California's Unfair Competition Law ('UCL'), False Advertising Law ('FAL') and Consumers Legal Remedies Act ('CLRA') together." *In re ConAgra*, 90 F. Supp. 3d at 982–83 (citing *Forcellati v. Hyland's, Inc.*, No. 12-cv-01983 GHK MRWX, 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014). "Each statute allows plaintiffs to establish materiality and reliance (i.e., causation and injury) by showing that a reasonable person would have considered the defendant's representation material." *Id.* at 983 (citations omitted). The standard "does not require that class members have a uniform understanding of the meaning of" the challenged representation. *Pettit*, 2017 WL 3310692, at *3.

The Ninth Circuit recently discussed the appropriate legal standard:

> Plaintiff's claims under the California consumer protection statutes are governed by the "reasonable consumer" test. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Under this standard, Plaintiff must "show that 'members of the public are likely to be deceived.' " *Id.* (citation omitted); *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995). This requires more than a mere possibility that [the product's] label "might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 129 Cal. Rptr. 2d 486, 495 (2003). Rather, the reasonable consumer standard requires a probability "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.*

*Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016). While the UCL only requires a likeliness that consumers will be deceived, the CLRA requires each potential class member have both an actual injury and show that the injury was caused by the challenged practice. *Korolshteyn v. Costco Wholesale Corp.*, No. 15-cv-00709 CAB RBB, 2017 WL 1020391, at *3 (S.D. Cal. Mar. 16, 2017), *reconsideration denied*, No. 15-cv-00709 CAB RBB, 2017 WL 5973547 (S.D. Cal. Mar. 31, 2017). "But '[c]ausation, on a classwide basis, may be established by materiality. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.' " *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (citing *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009)). "As a general rule, materiality may be established by common proof '[b]ecause materiality is judged according to an objective standard,' and so '[t]he alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all [consumers] composing the class.' " *Mullins v. Premier Nutrition Corp.*, No. 13-cv-1271 RS, 2016 WL 1535057, at *5 (N.D. Cal. Apr. 15, 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013)).

The Court notes that such material alleged misrepresentations were made here to the entire class, because no Canada Dry purchaser was not exposed to the alleged misrepresentation. Therefore, the standard requires only that the Court find there is a probability that reasonable consumers could be misled, not that they all believed "Made From Real Ginger" means the same thing. Plaintiffs have done that through the consumer understanding survey, which found that 78.5% of respondents believed "Made From Real

Ginger" meant made from ginger root.  Dkt. No. 180-1 at 33 (Dennis Decl.).

As to the common law fraud claim, "reliance may be presumed" if the defendant's misrepresentations or omissions were material.  *In re Brazilian Blowout Litig.*, No. 10-cv-08452 JFW MANX, 2011 WL 10962891, at *8 (C.D. Cal. Apr. 12, 2011) (citing *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971) ("[I]f the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class") and *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1085 (1993)).  In the Court's typicality discussion in section III.B.3.c.i., the Court found that both Fitzhenry-Russell and Margaryan had personally relied on the ginger claim, so reliance is not a problem as to the fraud claim.

Dr. Pepper would prefer that the Court group the "Made From Real Ginger" claim in the same bucket as cases that found the phrases "All Natural" and "100% Natural" to not be material to consumers' purchasing decisions because there was no common understanding of the term.  *Astiana*, 291 F.R.D. at 504; *Jones v. ConAgra Foods, Inc.*, No. 12-cv-01633 CRB, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014).  But the Court does not find that "Made From Real Ginger" is so vague as the term "natural," particularly given the above-mentioned results of the consumer understanding survey.  Again, that survey found that almost 80% of people thought "Made From Real Ginger" meant that Canada Dry was made using ginger root.

Moreover, Dr. Pepper's internal documents show that Dr. Pepper thought the "Made From Real Ginger" claim *was* material.  For example, in 2009, Dr. Pepper's internal documents revealed that 63% of people did not think ginger ale had ginger in it.  Dkt. No. 180-21 at 14 (Exh. 18, DPS_001113).  In the same exhibit, it is shown that to capitalize on the alleged health halo ginger products have to consumers, Canada Dry would encourage people to believe that "Canada Dry Ginger Ale is a [carbonated soda drink] that fits into your healthy lifestyle because it is made from real ginger."  *Id.* at 15 (Exh. 18, DPS_001114).  However, Canada Dry's internal documents reveal that when respondents were asked their reasons for drinking Canada Dry five years later, the top five

reasons were: (1) "I trust and respect the Canada Dry Brand (28%)", (2) "Drinking Canada Dry makes me feel better by soothing my stomach (26%)", (3) "Canada Dry is easy to find in stores (26%)", (4) "Canada Dry tastes good with food (25%)", and (5) "*Canada Dry is made with real ginger (25%)*". Dkt. No. 184-23 (Exh. 22, DPS_047475) (emphasis added). Essentially, Dr. Pepper's documents show that through its marketing, it orchestrated a change in consumer perceptions. Moreover, additional documents show that the purpose of the ginger claim was to make people believe that Canada Dry offers the health benefits of real ginger:



Dkt. No. 180-21 at 16. Perhaps the piece of evidence that most clearly shows that materiality of the ginger claim is a Dr. Pepper Snapple Group Canada Dry 2011 Agency Briefing dated December 15, 2009, which provides:

> 2009 Canada Dry Renovation "Made From Real Ginger" program is working
> - New news
> - Strong POD and message relevant to target consumer
> - Consumer awareness and brand equity increased
> - *Purchase frequency and volume growth escalated to +8.5%*

Dkt. No. 180-37 at 4 (Exh. 34, DPS_143308) (emphasis added).

As in *Kumar v. Salov N. Am. Corp.*, plaintiffs are aided in demonstrating materiality by defendant's internal documents, which demonstrate that "Made From Real Ginger" proved to be valuable in selling Canada Dry. 2016 WL 3844334, at *8 ("Materiality can be shown by a third party's, or defendant's own, market research showing the importance

of such representations to purchasers."); *Mullins v. Premier Nutrition Corp.*, No. 13-cv-01271 RS, 2016 WL 1535057, at *3 (N.D. Cal. Apr. 15, 2016) (defendant's own "[m]arketing research suggests the overwhelming majority of Joint Juice users purchased the product to obtain these benefits, and thus there is a reason to believe the represented health benefits were material."). Clearly, if a quarter of Canada Dry consumers were listing the ginger claim as a top five reason why they bought the product, the claim is material. Dr. Pepper cannot walk back evidence contained in its own documents.

### ii. Damages

The Court found that the price premium survey and choice-based conjoint are reliable when it considered Dr. Pepper's motion to exclude, but made no finding as to predominance. Under *Comcast*, "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." 569 U.S. at 35. If the model cannot measure such damages across the entire class under Rule 23(b)(3), it cannot be used. *Id.* But "[c]alculations need not be exact," though "any model supporting a plaintiff's damages case must be consistent with its liability case." *Id.* (citation and quotation marks omitted).

The most interesting argument Dr. Pepper presents against the price premium survey under predominance is that "it does not match [plaintiffs'] theory of liability. The survey purports to calculate a price premium associated with misleading consumers to believe the drink contains powdered or chopped ginger, but it does not do so—it calculates the premium associated with all possible meanings of the claim." Dkt. No. 183-4 at 30 n.15. This argument is woefully under-briefed. Plaintiffs' response is that their "theory of liability is that DPSG's label violates California law because it is likely to mislead a 'significant portion' of the public. The mere fact the claim was on the product caused all consumers to pay an inflated price, regardless of how they interpreted the claim." Dkt. No. 192 at 14 n.10.

Plaintiffs' case was potentially complicated by a fact that came out in discovery, that Canada Dry *does* contain traces of real ginger, in the form of ginger oleoresin. Dkt.

No. 183-4 at 8-10. In response to this news, plaintiffs modified their arguments. But these changes do not go beyond what the operative complaint anticipated. The complaint states:

> While it may be that some oil, protein, essence, or other extraction of the ginger root is used in the creation of the natural ginger flavor Defendants' product is made from, *that natural flavor is not "real ginger" as a reasonable consumer would understand it.* Rather, the scientists that created the Defendants' Products' "natural flavor" would have isolated proteins from the cells and tissue of the ginger root or extracted oils or essences from the ginger root. But because those isolated compounds may not actually taste like ginger, the scientist would have then combined those extractions with any number of other extractions from other plants and animals to create a flavoring substance that tastes like ginger.

Dkt. No. 97 at 7 (emphasis added); *id.* at 6 ("The Products are made from carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavor," which is a chemical flavoring compound that is manufactured to mimic the taste of ginger, but is not and does not contain real ginger as a reasonable consumer understands it and contains none of the health benefits of real ginger.").

And this is the point of plaintiffs' argument in the reply: even if there was ginger in Canada Dry, ginger oleoresin was not "real ginger" as consumers would understand the term. In support of this theory, plaintiffs present the rebuttal expert declaration and report of Randolph Culp, Ph.D.[8] Dkt. No. 192-1. The Court points out one of Culp's findings, that the concentration in parts per million of 6-gingerol and 6-shaogal, which are ginger-derived compounds, in Canada Dry is far below what a person would be able to detect when drinking the ginger ale. *Id.* at 8, 20. As a result, plaintiffs argue that there is no "functional" amount of ginger in Canada Dry that would provide consumers with any health benefits or the taste of ginger despite Dr. Pepper's advertising. Dkt. No. 198 at 9-10 (June 13, 2018, Hearing Transcript). This, plaintiffs claim, is the actionable misrepresentation because even if it is literally true that Canada Dry has ginger in it, the ginger is not what a reasonable consumer would expect. *Id.* at 11.

---

[8] Dr. Pepper did not challenge Culp's findings in their motion to exclude.

Therefore, to get back to the original dispute, what plaintiffs' price premium measures is how much the "Made From Real Ginger" claim is worth. And the worth of the "Made From Real Ginger" claim will only matter in the future if a jury does find that the claim is misleading (i.e., the jury will determine what the meaning of "Made From Real Ginger" is), based on the allegedly microscopic amount of ginger root in Canada Dry. Plaintiffs have not changed their theory of liability, and their damages model fits the theory of the case.[9] Thus, the Court finds that the price premium survey is able to calculate damages on a class-wide basis.

A secondary part of Dr. Pepper's argument against price premium is that Canada Dry's sale prices vary significantly depending on whether the drink is bought in a grocery store or convenience store, and so imposing a 4% price premium across the board is inappropriate. Dkt. No. 183-4 at 30. Dr. Pepper is wrong. In Weir's reply declaration, he made clear that applying a 4% price premium across the board is appropriate because he and Dr. Dennis accounted for the variation in pricing in the study between grocery and convenience stores. Dkt. No. 192-3 at 34 (Weir Reply Decl.). Moreover, to the extent that Dr. Pepper cites rebuttal expert Dr. Ugone as evidence against the price premium on this point, the Court points out that Dr. Ugone conceded that extrapolating the price premium to grocery and convenience stores would only be improper if plaintiffs' experts had used the grocery store prices as a baseline. *Id.* at 35 (citing Ugone Dep. at 106). Because this was not the case here, Dr. Pepper's argument lacks merit.

Plaintiffs have shown that common issues predominate over individual ones as to materiality, reliance, and damages, such that these issues may be resolved on a class-wide basis.

### b.  Superiority: Class Treatment Is Superior.

Lastly, the Court considers whether class action treatment is superior to allowing

---

[9] Even if the damages model is imperfect, at class certification, "Plaintiffs need only show that such damages can be determined without excessive difficulty and attributed to their theory of liability . . . ." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017).

the claims to be litigated individually. "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. Making this determination involves a comparative analysis of alternatives and consideration of the nonexhaustive factors enumerated in Rule 23(b). *Id.* Those factors are: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

Per plaintiffs, a class action is superior because in the absence of a class action, no individual plaintiff would file suit because the amounts at issue for each class member would likely be a few dollars. Dkt. No. 180 at 32. Dr. Pepper argues that class action treatment here would not be superior because applying a 4% premium on a class-wide basis would require an "Augean claims processing effort," and because plaintiffs cannot identify which consumers relied on the ginger claim in their Canada Dry purchases. Dkt. No. 183-4 at 31. But reliance does not need to be shown on a class-wide basis, and the difficulties associated with administrating the claim-processing exist in all class actions. This is why parties hire claims administrating firms to handle claim processing. Thus, the Court finds class action treatment superior.

Thus, because the Court finds that Federal Rules of Civil Procedure 23(a) and 23(b)(3) have been satisfied, the Court GRANTS plaintiffs' motion for class certification.

## C. Dr. Pepper's Motion to Seal Is GRANTED IN PART and DENIED IN PART.

Dr. Pepper moves to seal portions of its opposition to the motion for class certification, and certain exhibits to the opposition. Dkt. No. 183. Most of the proposed redactions are based on information Dr. Pepper wishes to keep under seal, along with Givaudan Flavors Corporation, who aids in the production of Canada Dry. Dkt. No. 189.

There is a presumption of public access to judicial records and documents. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Access to motions and their attachments that are "more than tangentially related to the merits of a case" may be sealed only upon a showing of "compelling reasons" for sealing. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101-02 (9th Cir. 2016). Conversely, filings that are only tangentially related to the merits may be sealed upon a lesser showing of "good cause." *Id.* at 1097. "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (quoting *Nixon*, 435 U.S. at 598).

Under Rule 26(c), a trial court has broad discretion to permit sealing of court documents for, among other things, the protection of "a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 26(c)(l)(G). The Ninth Circuit adopted the definition of "trade secrets" set forth in the Restatement of Torts, finding that "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972) (quoting Restatement (First) of Torts § 757 cmt. b).

Here, the Court addresses a motion to seal an opposition brief and exhibits. The sealed portions are more than tangentially related to the merits of the case. Therefore, the compelling reasons standard applies to this sealing motion. *Racies v. Quincy Bioscience, LLC*, No. 15-cv-00292 HSG, 2017 WL 6405612, at *2 (N.D. Cal. Dec. 15, 2017) (applying the compelling reasons standard to a motion for class certification); *Philips v. Ford Motor Co.*, No. 14-cv-02989 LHK, 2016 WL 7374214, at *2 (N.D. Cal. Dec. 20, 2016) (declining to decide whether the compelling reasons standard applied to class certification motions as a rule, and instead finding that the class certification brief

addressed the merits of the case).

Moreover, sealing motions must be "narrowly tailored to seek sealing only of sealable material." Civil L.R. 79-5(b). A party moving to seal a document in whole or in part must file a declaration establishing that the identified material is "sealable." Civil L.R. 79-5(d)(1)(A). Merely stating that a party designated material as confidential under a protective order is insufficient by itself to seal a document. *Id.*

Based on the Court's review of Dr. Pepper and Givaudan's representations, the Court seals only the following:

| Document | Location of Sealable Material |
|---|---|
| Dr. Pepper's opposition to Plaintiffs' motion for class certification | • Page 2, lines 14, 18-20, 26-27<br>• Page 3, lines 1-2, 12-13, 19-21 |
| Declaration of Monica Smith in support of Dr. Pepper's opposition to Plaintiffs' motion for class certification | • Exhibit 4 - Steve Kramer Deposition Transcript<br> ○ Page 165, lines 10–15<br> ○ Page 166, Lines 10, 15-16<br>• Exhibit 9 – James Hassel Declaration Transcript<br> ○ Page 13, lines 6–10<br> ○ Page 14, lines 15–18<br> ○ Page 15, lines 3–4, 6–7, 9, 12, 14<br> ○ Page 17, line 11<br> ○ Page 18, lines 10–11<br> ○ Page 24, lines 20–21, 23–25<br> ○ Page 25, line 21, 23, 25<br> ○ Page 26, lines 1–2, 5–6, 10–11, 13, 15–18, 20<br> ○ Page 27, lines 1–2, 24–25<br> ○ Page 28, lines 1–2, 9, 25<br> ○ Page 29, lines 8, 10–11, 13–25<br> ○ Page 30, lines 2–5<br> ○ Page 32, line 12, 14, 17–20<br> ○ Page 34, lines 24–25<br> ○ Page 35, line 1<br> ○ Page 35, lines 12–14<br> ○ Page 36, lines 11–13, 16–20<br> ○ Page 37, Lines 16, 21–25<br> ○ Page 38, lines 1–4, 18–19, 20–23<br> ○ Page 39, lines 12, 16–19<br> ○ Page 40, lines 13–14, 20 |

United States District Court
Northern District of California

| | |
|---|---|
| | ○ Page 44, lines 3–4 |
| | ○ Page 50, line 23 |
| | ○ Page 54, lines 19, 23–24 |
| | ○ Page 56, lines 5, 16, 20 |
| | ○ Page 57, lines 15, 19, 23 |
| | ○ Page 58, lines 1–2 |
| | ○ Page 59, line 24 |
| | ○ Page 60, lines 13, 15 |
| | ○ Page 68, line 25 |
| | ○ Page 69, lines 1, 4 |
| • Exhibit 10 | |

The Court realizes that it will only permit the sealing of a limited amount of the information Givaudan in particular seeks to retain under seal. However, the Court has not revealed the measurements of any of the ingredients in Canada Dry, nor information about the processing of the ginger allegedly contained in Canada Dry. Thus, except for the excerpts cited in the table above, the motion to seal is DENIED as both being not sufficiently narrowly tailored, and as not satisfying the compelling reasons standard.

### III. CONCLUSION

The Court GRANTS plaintiffs' class certification motion, and CERTIFIES the following class: "All persons who, between December 28, 2012 and the present, purchased any Canada Dry Ginger Ale products in the state of California."

The Court APPOINTS plaintiffs Fitzhenry-Russell and Margaryan as class representatives. The Court APPOINTS Gutride Safier LLP and the Margarian Law Firm as class counsel.

By July 6, 2018, the parties must jointly submit a proposal for class notification, with the plan to distribute notice by July 27, 2018.

As for the motion to seal, Dr. Pepper must refile the opposition to the motion for class certification with only the approved redactions consistent with this order by June 29, 2018.

**IT IS SO ORDERED.**

Dated: June 26, 2018

_____
NATHANAEL M. COUSINS
United States Magistrate Judge