UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACKIE FITZHENRY-RUSSELL, et al.,<br><br>    Plaintiffs,<br><br>        v.<br><br>KEURIG DR PEPPER INC., et al.,<br><br>    Defendants. | Case No.17-cv-00564-NC<br><br>**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

**INTRODUCTION**

Plaintiffs Jackie Fitzhenry-Russell and Gegham Margaryan ("Class Representatives") move for final approval of a proposed class action settlement with Defendants Keurig Dr Pepper Inc., f/k/a Dr Pepper Snapple Group, Inc., and Dr Pepper/Seven Up, Inc. ("Defendants"), the terms and conditions of which are set forth in the Settlement Agreement filed with the Court on January 4, 2019 ("Settlement Agreement"). Dkt. No. 327. The Court granted preliminary approval of the Settlement Agreement on January 10, 2019. Dkt. No. 335. On April 10, 2019, the Court held a final approval hearing on the Parties' Settlement Agreement. *See* Dkt. No. 348.

This case concerns the marketing and labeling of Canada Dry ginger ale ("Products") from December 28, 2012 to June 26, 2018 ("Class Period"), and it has been vigorously litigated for more than two years. As detailed below, the proposed settlement follows a Missouri state court's preliminary approval of a similar settlement in a similar class action.[1] A brief summary of the case history is as follows.

This case was filed in California Superior Court in December 2016, and then removed to federal court. Defendants filed two motions to dismiss that Plaintiffs opposed. When the second was lost, Defendants filed a motion to take an interlocutory appeal, which Plaintiffs opposed and the Court denied. During the same time period, two similar cases were filed by other law firms in California causing motion practice consolidating those actions with this one.

After the cases were consolidated, substantial discovery was taken by both parties. Defendants produced to Plaintiffs' counsel over 200,000 pages of documents. Plaintiffs also conducted three depositions of Defendants' employees, requested and received written discovery responses from Defendants and several third parties, and conducted expert discovery from five experts on both sides. The parties filed several discovery disputes that led to multiple re-depositions on both sides. *See* Dkt. Nos. 238, 260.

---

[1] Final approval of that settlement was granted on April 8, 2019. *See* Dkt. Nos. 346, 347.

On June 26, 2018, the Court certified a class to pursue the Made from Real Ginger Allegations, of "All persons who between December 28, 2012 and [June 26, 2018] purchased any Canada Dry Ginger Ale products in the state of California" (the "California Class"). Dkt. No. 199. Plaintiffs' counsel filed additional cases in Massachusetts and New York to cover remaining states. The Parties then agreed to mediation with Robert A. Meyer, Esq., of JAMS in Los Angeles, California. Thereafter, on November 2, 2018, the Court granted in part and denied in part Defendants' motion for summary judgment, finding that the Canada Dry Ginger Ale was literally "Made from Real Ginger." *See* Dkt. No. 261. The parties have since been preparing for a jury trial in January 2019, on the remaining theories of liability: (1) whether Defendants' "Made from Real Ginger" label falsely or misleadingly implies that its Products are made from ginger root; and (2) whether Defendants' "Made from Real Ginger" label falsely or misleadingly implies that its Products have health benefits.

On the eve of trial in this case, Defendants engaged in mediation with other counsel who had brought later-filed cases in various state courts, using another JAMS mediator, retired United States District Judge Wayne Andersen. Once settlement was reached, those plaintiffs filed a 49-state class action (all states except California) in state court in Missouri on December 11, and obtained an order finally approving a 49-state settlement on April 8, 2019. *See* Dkt. Nos. 346, 347. In that settlement, Defendants agreed to change the label of Canada Dry Ginger Ale to remove the challenged "Made from Real Ginger" claim consistent with the proposal Plaintiffs in this case claim they made during the August 2018, mediation in California. Defendants also agreed to provide refunds to class members of 40 cents per product unit, up to $5.20 (or 13 purchases) without proof of purchase, or $40.00 (or 100 purchases) with proof of purchase. *See* Dkt. No. 321, Ex. B ¶ 4.4.

After learning of the Missouri Settlement, Plaintiffs communicated with the two JAMS mediators, Robert Meyer and Wayne Andersen. A series of mediated negotiations followed, leading to this proposed settlement.

3

Plaintiffs in this action have indicated throughout the case that the primary relief they sought was an injunction requiring Defendants to change their "Made from Real Ginger" label. In this Settlement, Defendants are stipulating to a California injunction requiring that change. Specifically, the Parties agree that Defendants must cease using the phrase "Made from Real Ginger" in any labeling of any Canada Dry Ginger Ale. *See* Dkt. No. 325 ¶ 3.1. Defendants must also include on the labels the words "taste," "extract," or "flavor" if they continue to use references to "ginger," "real ginger," or "natural ginger" on their label claims. *See id.* ¶¶ 3.2, 3.3.

Plaintiffs also sought to recover on behalf of the California class restitution of the "premium" price that is attributable solely to the "Made from Real Ginger" claim. Plaintiffs contended this premium was $10,778,477.16 for the California Class during the Class Period, representing an average of $.09 per product. Plaintiffs' price premium calculations were based on a methodology called "conjoint analysis," which uses a survey and market simulator to determine the value that consumers place on various product attributes. Defendants' experts criticized the analysis on several grounds, offered competing evidence of the absence of a price premium and suggesting "line pricing" of soft drinks, and concluded that Plaintiffs suffered no damage.

In the Settlement, Defendants agree to pay $0.40 per Unit purchased, with a guaranteed minimum payment of $2.00 for valid Claims. Dkt. No. 325 ¶ 4.4. No Proof of Purchase is required to obtain a payment for up to 13 Units purchased (*i.e.*, payments up to $5.20 per household); while Proof of Purchase is required to obtain a payment of more than $5.20 (*i.e.*, for more than 13 Units purchased per household), up to a maximum of 100 Units (*i.e.*, $40.00 per household). *Id.* Every claim will be paid at least $2.00 even if there were fewer than 5 purchases. *Id.* Even if Plaintiffs won at trial, class members would still need to make a claim in order to receive compensation. Under the Settlement, class members were required to submit their claims by March 19, 2019. *See* Dkt. No. 335 at 9.

As part of the Settlement, Plaintiffs' attorneys move for an award of up to $2,250,000.00 inclusive of fees and costs from Defendant to pay their attorneys' fees and

4

1  expenses, plus up to $5,000 from Defendant as a payment to the Class Representatives.
2  *See* Dkt. No. 345 at 17, Dkt. No. 345-2 ("Gutride Decl.").  Plaintiffs' attorneys will receive
3  an additional $750,000 under a separate agreement if the 49-State Settlement is approved
4  and upon dismissal of the Massachusetts and New York cases.  *See* Dkt. No. 325, Ex. G at
5  4.  The total amount of attorneys' fees and costs ($3 million) will cover less than 60% of
6  Class Counsel's asserted lodestar, which Class Counsel estimates is $4,354,524.98.  *See*
7  Gutride Decl. at 5.
8        Notice was provided as described in the Settlement Agreement and approved in the
9  Court's January 10, 2019, order granting preliminary approval consistent with a notice
10 plan designed by Heffler Claims Group, a well-known and experienced class action
11 administrator.  To provide notice, Heffler directly mailed 953 notices to California
12 addresses and emailed 1,989 notices to email addresses provided by the Parties.  *See* Dkt.
13 No. 345-1 ("Finegan Decl.") ¶ 16.  Heffler also provided the notice of the Settlement as
14 required under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(b).  *Id* ¶ 17; *see*
15 *also id.*, Ex. A.  Notice was also published multiple media, including *People Magazine* and
16 *Good Housekeeping*, referring Class Members to the settlement website.  *Id.* ¶¶ 18–19.
17 Heffler advertised the Settlement and claims process on multiple third-part websites (both
18 desktop and mobile), including Facebook and Instagram, resulting in approximately 145
19 million advertisement impressions targeted at likely members of the Class based on
20 demographic data.  *Id.* ¶ 20.  A press release regarding the Settlement was issued over PR
21 Newswire's US1 Newslines and published by 159 news outlets.  *Id.* ¶ 22.  Heffler also
22 created a dedicated website for the Settlement at www.cdgasettlement.com, which
23 received over 1,145,000 page views from 494,994 users.  *Id.* ¶¶ 23–24.  Finally, Heffler
24 engaged in a claim stimulation program to target likely Class Members by featuring the
25 settlement in an email sent to topclassactions.com's subscribers, two broadcast interviews,
26 and targeting social media advertisements on health and cooking websites.  *Id.* ¶¶ 26–29.
27       Out of an estimated 2,380,000 million California purchasers of the Products, Heffler
28 reports that 91,254 claims were filed in connection with the Settlement in this case for a

claim rate of approximately 4%.[2] *See id.* ¶¶ 4, 30–33. Heffler also received 318 timely opt-out requests from the Settlement. *Id.* ¶ 36. Defendant alone will pay the notice and administration costs associated with the Settlement.

Defendants deny that there is any factual or legal basis for Plaintiffs allegations. They contend that the labeling of the Products was truthful and non-misleading, and that purchasers did not pay a "premium" for the Products as the result of any misrepresentations. As explained above, they also challenge the methodology and conclusions of Plaintiffs' experts. They also deny that Plaintiffs or any other purchasers have suffered injury as a result of the "Made from Real Ginger" representation or are entitled to monetary or other relief.

**FINDINGS AND CONCLUSIONS**

As a threshold matter, this Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1332(d) and 1453. All parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). *See* Dkt. Nos. 15, 19.

The Court will first discuss final approval of the proposed Settlement. Then, the Court will address Class Counsel's request for attorneys' fees, costs, and whether service awards should be granted to the named plaintiffs. Finally, the Court will address the objections to the Settlement.

**I.  Final Approval**

Federal Rule of Civil Procedure 23(e)(2) requires courts to "approve [class settlements] only after a hearing and only on finding that it is fair, reasonable, and adequate . . ." *See also Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco,* 688 F.2d 615, 625 (9th Cir. 1982) ("the universally applied standard is whether the settlement is fundamentally fair, adequate, and reasonable"). To make this evaluation, courts in the Ninth Circuit look to the eight *Churchill* factors:

(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and

---

[2] 71,016 claims were submitted in connection with the 49-State Settlement. *Id.* ¶ 4.

1  likely duration of further litigation; (3) the risk of maintaining class action
2  status throughout the trial; (4) the amount offered in settlement; (5) the extent
3  of discovery completed and the stage of the proceedings; (6) the experience
4  and view of counsel; (7) the presence of a government participant; and (8) the
5  reaction of the class members of the proposed settlement.

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015). However, the "relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625. The determination of whether a proposed settlement is fair falls within the sound discretion of the district court. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

Here, considering the *Churchill* factors, the Court finds that the Settlement is fair, reasonable, and adequate. First, as to the strength of Plaintiffs' case, Plaintiffs have achieved their stated goal in this litigation: alter Defendants' allegedly misleading Product label and recover damages for the price premium attributed to that label. Although this case did not present particularly novel or complex issues, the Court had previously granted in part and denied in part summary judgment on Plaintiffs' claims, finding that reasonable consumers could disagree as to whether Defendants' label was misleading. *See* Dkt. No. 261. Legal uncertainty tends to favor approval of settlement. *See, e.g.*, *In re Yahoo Mail Litig.*, No. 13-cv-4980-LHK, 2016 WL 4474612, at *6 (N.D. Cal. Aug. 25, 2016) (citing *Browning v. Yahoo! Inc*, No. 04-cv-01463-HRL, 2007 WL 4105971, at *10 (N.D. Cal. Nov. 16, 2007)). Thus, this factor weighs in favor of approval.

Second, the risk, expense, and duration of further litigation also weighs in favor of final approval. Although the Settlement was reached on the eve of trial, trial was anticipated to last over a week. *See* Dkt. No. 271 at 5. The parties would likely have incurred significant costs to try the case before a jury. *See, e.g.*, Dkt. No. 308 (order

1    appointing additional class counsel for trial purposes). Even after trial, there was a strong
2    possibility of expensive and time-consuming post-trial motion practice or appeals given
3    the vigorous litigation history of this case.

4    Third, although there was little risk of maintaining class action status throughout the
5    trial as the Class consists of a fixed group of consumers, Plaintiffs acknowledge that they
6    may face "substantial challenges in establishing the amount of class-wide damages." *See*
7    Dkt. No. 327 at 26. Thus, this factor weighs against approval.

8    Fourth, the Settlement provided both significant injunctive relief and monetary
9    relief to the Class. At summary judgment, Plaintiffs' expert opined that the "Made from
10   Real Ginger" label commanded a price premium of $0.14 to $0.28 per unit. *See* Dkt. No.
11   237-25 ("Dennis Report") ¶¶ 65, 66. The Settlement provides monetary recovery of $0.40
12   per Unit with a guaranteed minimum payment of $2.00 per claim. *See* Dkt. No. 325 ¶ 4.4.
13   The Settlement also requires Defendants to cease using the allegedly misleading label and
14   clarify that its Products are made with ginger "taste," "extract," or "flavor." *See id.* ¶¶ 3.2,
15   3.3. Thus, this factor weighs in favor of approval.

16   Fifth, substantial discovery had been completed and, as stated above, this lawsuit
17   was on the eve of trial prior to the Settlement. The parties have engaged in two motions to
18   dismiss, a motion for class certification, a motion to certify the case for interlocutory
19   appeal, a motion for summary judgment, motions in limine, and numerous discovery
20   disputes. This factor weighs in favor of approval.

21   Sixth, Class Counsel and Defendants' counsel are experienced in class action
22   litigation. Both parties' counsel have expressed favorable views of the Settlement. Thus,
23   this factor also weighs in favor of approval.

24   The seventh factor—the presence of a government participant—is inapplicable.
25   There is no government participant in this lawsuit.

26   Eighth, the reaction of class members to the proposed Settlement is overall positive.
27   The parties anticipated that 100,000 claims would be filed under the Settlement (*see* Dkt.
28   No. 327-5 ¶ 36)—91,254 claims were actually filed (*see* Finegan Decl ¶ 4). The 4% claim

8

1    rate was reasonable in light of Class Counsel and Heffler's efforts to ensure that notice was
2    adequately provided to the Class.  Likewise, the claim rate is within the range of response
3    rates approved by the Ninth Circuit.  *See, e.g.*, *Online DVD-Rental Antitrust*, 779 F.3d at
4    941 (approving settlement with 3.4% claim rate).  Furthermore, Heffler only received 318
5    requests to opt out of the Settlement and only two objections were made.  Thus, the overall
6    positive reaction of the Class weighs in favor of approval.  In sum, the *Churchill* factors
7    overall weigh in favor of approving the Settlement.

8    Finally, the Court has found no evidence of collusion between Plaintiffs and
9    Defendants.  The Settlement resulted from extensive arms-length, adversarial negotiation
10   leading up to the eve of trial in a vigorously litigated case.  In short, the Court finds that
11   there was no collusion between the parties.  *See In re Bluetooth Headset Prods. Liab.*
12   *Litig.*, 654 F.3d 935, 947 (9th Cir.2011) (the three factors to determine whether a
13   settlement is collusive are: "(1) when counsel receive a disproportionate distribution of the
14   settlement, . . . (2) when the parties negotiate a 'clear sailing' arrangement providing for
15   the payment of attorneys' fees separate and apart from class funds, . . . and (3) when the
16   parties arrange for fees not awarded to revert to defendants . . .").

17   Accordingly, the Court finds that the Settlement is fair, reasonable, and adequate
18   and GRANTS final approval of the Settlement.

19   **II.   Attorneys' Fees and Service Awards**

20   Class Counsel requests $2,250,000 in attorneys' fees and costs.[3]  *See* Dkt. No. 327 at
21   34.  Of that amount, $424,879.69 are costs, while the remainder of the requested award
22   constitute attorneys' fees.  *See* Gutride Decl. ¶ 5.  Class Counsel also requests $5,000 in
23   service awards to the two named plaintiffs: Jackie Fitzhenry-Russell and Gegham
24   Margaryan.  Dkt. No. 327 at 38.  The Court will address each award in turn.

---

[3] As noted previously, Class Counsel are also entitled to $750,000 in the 49-State Settlement.  *See* Dkt. No. 325, Ex. G at 4.  Although this amount is not subject to this Court's approval, the Court will consider that amount in its analysis of the reasonableness of the requested attorney's fees.

9

### A. Attorneys' Fees and Costs

"[I]n class actions brought under fee-shifting statutes . . . where the relief sought—and obtained—is often primarily injunctive in nature[,]" courts employ the "lodestar method" to determine the reasonableness of attorneys' fees. *Bluetooth Headset Prods. Liab.*, 654 F.3d at 941. The lodestar is calculated by multiplying the number of hours reasonably expended by the prevailing party by a reasonable hourly rate. *Id.* Then, the district court may adjust the lodestar by an appropriate multiplier to reflect "reasonableness factors, including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.* at 941–42 (internal quotation marks and citation omitted).

Here, Class Counsel seek $2,250,000, inclusive of $424,879.69 in costs. *See* Gutride Decl. ¶ 5. The Court finds that the requested $2,250,000 award is reasonable, even when considered in combination with the potential $750,000 award under the 49-State Settlement. Less litigation costs, the total requested attorneys' fees award equals $1,825,120.31. If the $750,000 award from the 49-State Settlement is included, the total attorneys' fee award will equal $2,575,120.31. Class Counsel estimates their lodestar at $4,354,524.98. Gutride Decl. ¶ 5. The lodestar was estimated by multiplying the total number of hours expended over two years of litigation—5,741.8—by hourly rates ranging from $202 for paralegals and clerks to $894 for the most senior attorneys with 20 years of experience. *See id* ¶ 3; *see also* Dkt. No. 327-1 ¶¶ 69–70. This amounts to a downward lodestar multiplier of 0.42 if the potential award under the 49-State Settlement is disregarded and a multiplier of 0.59 if it is included. This result is reasonable, particularly given that the attorneys' fees award is separate from the monetary relief provided to the Class. *See, e.g.*, *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 690–91 (N.D. Cal. 2016) (approving lodestar multiplier of 0.68); *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 10-md-02143-RS, 2016 WL 7364803, at *9 (N.D. Cal. Dec. 19, 2016) (approving lodestar multiplier of 1.29); *Covillo v. Specialtys Café*, No. 11-cv-00594-DMR, 2014 WL 954516, at *7 (N.D. Cal. Mar. 6, 2014) (approving lodestar multiplier of 0.65).

1  Furthermore, as noted above, Class Counsel achieved a strong result through
2  skillful litigation and settlement negotiation.  Class Counsel successfully navigated two
3  motions to dismiss, a motion for class certification, a motion for summary judgment, and
4  numerous discovery disputes.  The Settlement provides monetary relief in excess of the
5  damages estimated by their expert at summary judgment, and also provides injunctive
6  relief directly targeted at the alleged misconduct at the core of this lawsuit.  In short, the
7  Settlement was a favorable outcome for the Class.  Furthermore, although the issues
8  presented in this lawsuit were not particularly novel or complex, the litigation and
9  Settlement appear to be the work of experienced attorneys with significant expertise in
10 consumer class actions.

11 Further supporting the reasonableness of the request, Class Counsels' litigation
12 expenses are subsumed within the $2,250,000 award.  Class Counsel provided its litigation
13 costs in an itemized breakdown.  *See* Gutride Decl., Ex. A.  The Court finds that Class
14 Counsel's expenditure of $424,879.69 in litigation costs was reasonable and necessary for
15 effective representation of the class.  *See* Fed. R. Civ. P. 23(h); *Theriot v. Celtic Ins. Co.*,
16 No. 10-cv-04462-LB, 2011 WL 1522385, at *7 (N.D. Cal. Apr. 21, 2011) ("Class counsel
17 are entitled to reimbursement of reasonable out-of-pocket expenses.").

18 Accordingly, the Court approves the requested attorneys' fees and costs award of
19 $2,250,000.

20 **B.  Service Awards**

21 Class representative awards or service awards "are discretionary . . . and are
22 intended to compensate class representatives for work done on behalf of the class, to make
23 up for financial or reputational risk undertaken in bringing the action, and, sometimes, to
24 recognize their willingness to act as a private attorney general." *Rodriguez v. West*
25 *Publishing Corp.*, 563 F.3d 948, 958–959 (9th Cir. 2009).  In making the discretionary
26 determination whether to grant such an award, the district court considers relevant factors
27 including "the actions the plaintiff has taken to protect the interests of the class, the degree
28 to which the class has benefitted from those actions, . . . [and] the amount of time and

effort the plaintiff expended in pursuing the litigation." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).

Here, Plaintiffs request a service award of $5,000 for each of the two named plaintiffs: Jackie Fitzhenry-Russell and Gegham Margaryan. *See* Dkt. No. 327 at 38. Class Counsel attested to Fitzhenry-Russell and Margaryan's cooperation and work in this case, averring that both Plaintiffs responded to discovery requests, preparing for trial, and actively participating in the litigation. *See* Dkt. No. 327-1 ¶¶ 59–60. Plaintiffs also entered into a broader release of their claims than other class members. *Id.* ¶ 59.

The Court agrees with Class Counsel that Plaintiffs' efforts merits a service award, and finds that $5,000 is reasonable and appropriate compensation for the work and risk undertaken by spearheading this litigation as class representatives. *See*, *e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (approving $5,000 to two plaintiff representatives of 5,400 potential class members in $1.75 million settlement); *Hopson v. Hanesbrands, Inc.*, No. 08-cv-0844-EDL, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) (approving $5,000 award to one member of 217-member class from $408,420 settlement amount).

### III. Objections to the Settlement

Only two objections were made to the Settlement. *See* Finegan Decl. ¶ 36; *see also* Dkt. No. 344. One objection was submitted to Heffler by Patrick Sweeney. *See* Finegan Decl. ¶ 36; *see also id.*, Ex. G ("Sweeney Obj."). The other objection was filed with the Court by David Greenstein. *See* Dkt. No. 344 ("Greenstein Obj."). The Court will address each objection below.

#### A. Sweeney Objection

Sweeney timely submitted his objection to Heffler by March 18, 2019. *See* Sweeney Obj. Sweeney objects on four grounds:

1. The claims administration process is unreliable;
2. No timeframe for completing the administration of monetary relief for the class;

12

1
2
3

      3. Some amount of attorneys' fees should be withheld to ensure Class Counsel's continued oversight with the settlement; and

      4. Class Counsel's attorneys' fees are unreasonably high.

*Id.* at 85–87. Sweeney's objections are procedurally defective and fail on the merits.

      First, as recognized by other courts in this District, the Court notes that Sweeney is a serial objector. *See, e.g.*, *In re Yahoo Mail Litig.*, 2016 WL 4474612, at *8 ("Sweeney is a serial objector. During Sweeney's deposition, Sweeney revealed that he had objected in 25 federal cases across the country."); *In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. 12-md-02330-EMC, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) ("Mr. Sweeney is a serial objector, and apparently, he lacks standing as well . . ."); *Brown v. Hain Celestial Grp., Inc.*, No. 11-cv-03082-LB, 2016 WL 631880, at *10 (N.D. Cal. Feb. 17, 2016) (noting that Sweeney is a "'professional' objector"); *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, 2014 WL 3404531, at *7 n.4 (N.D. Cal. July 11, 2014) ("[A]ttorney Patrick Sweeney also has a long history of representing objectors in class action proceedings.").

      In addition, Sweeney's objections did not follow the proper procedure. In the Court's January 10, 2019, order granting preliminary approval of the class settlement, the Court stated that objections "must satisfy the requirements set forth in the Long Form Notice and *must be filed with the Clerk of the Court* . . . no later than March 19, 2019, or it will be rejected." Dkt. No. 335 at 8 (emphasis added). Although Sweeney's objection purports to have been filed with the Clerk of the Court (*see* Sweeney Obj. at 88), it was not filed with the Clerk.

      Turning to the merits, Sweeney's objections are unavailing. Sweeney presents no evidence that the claim administration process is unreliable. Moreover, the Court retains jurisdiction over this case to ensure that the claims administrations process proceeds as required. Finally, as explained above, Class Counsel's requested attorneys' fees are reasonable. Accordingly, the Court OVERRULES Sweeney's objections.

### B. Greenstein Objection

Greenstein filed his objections with the Court on March 25, 2019. *See* Greenstein Obj. Greenstein objects on three grounds:

1. Class Counsel's attorneys fees are unreasonably high;
2. Whether there is a limit on the settlement; and
3. Who gets the money left over from the settlement.

*See* Greenstein Obj. at 1. Greenstein's objections, however, were untimely. The deadline for submitting objections was March 19, 2019. *See* Dkt. No. 335 at 9. Greenstein did not file his objections until March 25, 2019. *See* Greenstein Obj.

On the merits, Greenstein's objections are also unavailing. As explained above, Class Counsel's requested attorneys' fees are reasonable and the fees and costs award represents a significant negative multiplier to Counsel's lodestar. As for Greenstein's second objection, the Settlement provides that Defendants may terminate the agreement if more than 1 million valid claims were submitted. *See* Dkt. No. 325 § 13.1. That limit was not reached. *See* Finegan Decl. ¶ 4. Finally, the structure of the Settlement leaves no possibility of leftover money. The Settlement does not create a settlement fund; rather, Defendants agreed to pay out individual claims subject to a cap on total claims. *See* Dkt. No. 325 §§ 4.4, 13.1. Accordingly, the Court OVERRULES Sweeney's objections.

### IV. Conclusion

#### A. Final Approval of Settlement

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Approval of Settlement. The Court GRANTS Plaintiffs' motion for attorneys' fees, costs, and service awards. Class Counsel is awarded $2,250,000 in attorneys' fees and costs, and plaintiffs Jackie Fitzhenry-Russell and Gegham Margaryan are each awarded $5,000. All valid Claims must be paid according to the terms of and by the deadlines set forth in the Settlement.

#### B. Release by Named Plaintiffs

Named Plaintiffs Jackie Fitzhenry-Russell and Gegham Margaryan, including any

14

person claiming rights derivative of named Plaintiffs as their parent, child, heir, guardian, associate, co-owner, attorney, agent, administrator, executor, devisee, predecessor, successor, assignee, assigns, representative of any kind, shareholder, partner, director, employee or affiliate, on the one hand, and Defendants on the other hand, shall mutually release and forever discharge each other from and shall be forever barred from instituting, maintaining, or prosecuting:

(1) any and all actions, causes of actions, claims, administrative claims, demands, rights, damages, obligations, suits, debts, liens, penalties, fines, contracts, agreements, judgments, expenses, costs, liabilities, and causes of action of every nature and description, whether known or unknown, suspected or unsuspected, existing now or arising in the future, that actually were, or could have been, asserted in the Action, that (i) is or are based on any or any alleged act, omission, inadequacy, misstatement, representation, misrepresentation, fraud, deception, harm, matter, cause, or event pertaining to the Products that has occurred at any time from the beginning of time up to and including the entry of the January 10, 2019, order granting preliminary approval (Dkt. No. 335), (ii) arise from or are related in any way to this case, the Products or the design, manufacturing, testing, packaging, marketing, advertising, promoting, labeling, or sale of the Products, or (iii) includes any Canada Dry branded products which contain the terms "Made From Real Ginger," including, but not limited to, those listed in the second amended complaint (Dkt. No. 97) and all Products (the "Released Claims");

(2) without limiting the foregoing, the release specifically extends to any claims related to the permitted sell-through of existing stock, as provided in the Settlement, as well as claims that named Plaintiffs do not know or suspect to exist in their favor at the time that the Settlement, and the release contained herein, becomes effective. Named Plaintiffs shall, by operation of this Order and Judgment, be deemed to have waived any and all provisions, rights, and benefits conferred by any law of any state of the United States, or principle of common law or otherwise, which is similar, comparable, or equivalent to section 1542 of the California Civil Code, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Named Plaintiffs understand and acknowledge the significance of these waivers of California Civil Code section 1542 and any other applicable federal or state statute, case law, rule or regulation relating to limitations on releases.  In connection with such waivers and relinquishment, named Plaintiffs acknowledge that they are aware that they may hereafter discover facts in addition to, or different from, those facts that they now know or believe to be true with respect to the subject matter of the Settlement, but that it is their intention to release fully, finally, and forever all Released Claims with respect to the Defendants, and in furtherance of such intention, the release of the Released Claims will be and remain in effect notwithstanding the discovery or existence of any such additional or different facts.

**C.   Release by Class Members**

Class Members (except any such person who has filed a proper any timely request for exclusion from the Class), including any person claiming derivative rights of the Class Member as the Class Member's parent, child, heir, guardian, associate, co-owner, attorney, agent, administrator, executor, devisee, predecessor, successor, assignee, assigns, representative of any kind, shareholder, partner, director, employee or affiliate, shall release and forever discharge the Defendants from any and all actions, causes of actions, claims, administrative claims, demands, rights, damages, obligations, suits, debts, liens, penalties, fines, contracts, agreements, judgments, expenses, costs, liabilities, and causes of action of every nature and description, whether known or unknown, suspected or unsuspected, existing now or arising in the future that were or could have been asserted in this case regarding the labeling, advertising, or formulation of the Products (the "Released Claims").

With respect to the released claims set forth above, Class Members shall be deemed to have waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits conferred by any law of any state of the United States, or principle of common law or otherwise, which is similar, comparable, or equivalent to section 1542 of the California Civil Code, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

The Class Members understand and acknowledge the significance of these waivers of California Civil Code section 1542 and any other applicable federal or state statute, case law, rule or regulation relating to limitations on releases. In connection with such waivers and relinquishment, the Class Members acknowledge that they are aware that they may hereafter discover facts in addition to, or different from, those facts that they now know or believe to be true with respect to the subject matter of the Settlement, but that it is their intention to release fully, finally, and forever all Released Claims with respect to the Defendants, and in furtherance of such intention, the release of the Released Claims will be and remain in effect notwithstanding the discovery or existence of any such additional or different facts.

The Parties shall be deemed to have agreed that the release set forth herein will be and may be raised as a complete defense to and will preclude any action or proceeding based on the Released Claims.

However, this order and judgment in this case does not bar or release any claim for personal injury or property damage arising out of the use of the Products, nor shall anything in this order and judgment in this case bar any defense, cross-claim, or counter-claim in any action initiated by any of the Defendants against any Class Member.

### D. Permanent Injunction

Defendants are hereby ENJOINED AND RESTRAINED beginning on the Effective Date of the Settlement from using the phrase "Made from Real Ginger" in any labeling of any Canada Dry Ginger Ale. Defendants may use any of the following words and phrases: "ginger," "real ginger," or "natural ginger," in combination with one of the following three words: "taste," "extract," or "flavor." Defendants may also use the phrases "ginger extract," "natural ginger flavor extract," "natural ginger extract," "natural ginger flavor," or "ginger flavor" in the label ingredient line. This injunction does not limit other usages and combinations of other words or phrases.

Defendants and their packaging suppliers, bottlers, distributors, wholesalers and retailers of Canada Dry Ginger Ale Products may sell-through all remaining stock of the existing label and introduce the new label as they sell through existing stock. The sell-through shall not require the withdrawal or destruction of any existing labels or recall of Product. Instead, the new label must begin to be phased into the market on or about the later of 120 days after the Effective Date of the Settlement or June 1, 2019, and the transition to new labels must be completed no later than the later of 120 days after the Effective Date of the Settlement or January 1, 2020 (or any further extension of the United States Food and Drug Administration's deadline for new nutrition fact panel changes); provided, however, that because Defendants cannot control all sources of old stock in the market, neither Defendants nor any bottler, distributor, wholesaler or retailer would be penalized or be liable for *de minimis* sales of old stock after that date.

### E. Post-Distribution Accounting

Within 21 days of the distribution of the settlement funds and attorneys' fees, and not later than 120 days from the date of this order, Class Counsel must file a Post-Distribution Accounting report indicating whether Defendants have complied with the Settlement's injunctive terms and accounting for the distribution of settlement funds to class members, named plaintiffs, counsel, and the claims administrator.

**F.     Retention of Jurisdiction**

The Court retains subject matter jurisdiction over the claims in this action and personal jurisdiction over Defendants and the class members for purposes of enforcing this Court's final approval order and the terms of the Settlement.  This retention of jurisdiction does not affect the finality of the Court's judgment.

**IT IS SO ORDERED.**

Dated:  April 10, 2019                                        _____
                                                                           NATHANAEL M. COUSINS
                                                                           United States Magistrate Judge